Transamerica Commercial Finance Corporation and Transamerica Fleet Leasing Corporation (hereinafter together called "Transamerica")[1] appeal from a judgment entered by the Montgomery Circuit Court for Union Bank Trust Company.
In 1984, Transamerica executed a "floor plan" agreement with Tom Wright, d/b/a T W Coach Sales. The agreement provided that Transamerica would finance T W's purchase of vehicles for resale in exchange for a security interest in T W's existing and after-acquired collateral. Transamerica properly perfected its security interest in T W's inventory by filing a financing statement with the Secretary of State of Alabama.
From 1984 to 1988, Transamerica financed, pursuant to the security agreement, the purchase of many vehicles for T W. The security agreement provided that, until the vehicles were sold by T W, Transamerica had the right to hold in its possession the "certificates of origin" or the "manufacturer's statements of origin"[2] relating to the vehicles purchased by T W and financed by Transamerica:
 "If applicable, [T] W] shall upon the request of [Transamerica], deliver to [Transamerica] the Certificate of Title, Certificate of Origin or Manufacturer's Statement of Origin issued for each item of inventory consisting of Vehicles and [Transamerica] shall have the right to hold the same until such items of inventory are sold and to have its lien or security interest noted thereon." (Emphasis added.)
Edward Price, Transamerica's "division control manager" for Montgomery, stated that upon receipt of notice that a vehicle it had financed had been sold, Transamerica would release to T W the certificate of origin ("CO") and the manufacturer's statement of origin ("MSO") for that vehicle. It is not disputed, and the security agreement states, that Transamerica could note its security interest in a vehicle on the CO and MSO for that vehicle.
The six vehicles made the basis of this appeal, five limousines and a hearse, were purchased by T W in 1987 and 1988 pursuant to the security agreement with Transamerica. It is not disputed that Transamerica had a perfected security interest in those six vehicles. Subsequently, T W informed Transamerica that it had sold the six vehicles. It is undisputed that Transamerica released the CO's for those vehicles to T W; however, Transamerica did not note thereon its security interest in the vehicles. The vehicles were purchased by Wright Leasing Company, which was owned and operated by Tom Wright, and its place of business was located at the same address as T W. Transamerica *Page 1301 
was aware of the existence of Wright Leasing; however, at the time the six vehicles were sold, it did not know that the vehicles were sold to Wright Leasing.
Subsequent to the transfer of the six vehicles to Wright Leasing, Wright Leasing approached Union Bank to obtain loans to pay for the six vehicles. As indicia of ownership of the vehicles, Wright Leasing presented the CO's and MSO's for the vehicles to Union Bank.[3] Union Bank lent the purchase money for the six vehicles to Wright Leasing. In turn, Wright Leasing paid T W the purchase prices of the vehicles. However, because of "cash flow problems," T W did not remit to Transamerica the amount it owed for the vehicles. Wright Leasing defaulted on its note payments to Union Bank. Union Bank repossessed the vehicles from Wright Leasing.
Transamerica filed a complaint for declaratory judgment and a temporary restraining order against Union Bank. In its complaint, Transamerica alleged that it had a prior security interest in the six vehicles. The trial court granted Transamerica's application for a temporary restraining order. Thereafter, Transamerica filed an application for a preliminary injunction, in which it requested the trial court to enjoin Union Bank from transferring the vehicles until such time as the trial court could hold a hearing on the merits of its complaint. The trial court granted the application. The case was tried without a jury, and the trial court held that Transamerica did not have a security interest in the vehicles. It further held that, even if Transamerica had a security interest in the vehicles, it was estopped from asserting that it had such a security interest and that it had waived its right to claim a security interest. The trial court entered a judgment for Union Bank. Transamerica appeals.
This Court decides this case on the following issues:
 I. Whether Transamerica is estopped from arguing, or has waived its right to argue, that it has a security interest in the six vehicles.
 II. Whether the trial court erred in holding that, pursuant to Ala. Code 1975, § 7-9-307(1), Wright's Leasing was a "buyer in the ordinary course of business."
 I.
At trial, Transamerica's primary argument was that, pursuant to the Uniform Commercial Code, it had a prior security interest in the six vehicles. Union Bank argued that, under the Uniform Commercial Code, Transamerica was estopped from asserting its alleged prior security interest in the vehicles. Specifically, Union Bank argued: Transamerica's security interest was not listed on the CO's and MSO's for the six vehicles, which, in turn, were presented to Union Bank as collateral for the notes; it is the custom in the lending industry to forgo searches for financing statements on vehicles where one is presented with unrestricted CO's and MSO's; because no security interest was listed on the CO's and MSO's, Transamerica was estopped from asserting its alleged security interest in the vehicles.
In its order, the trial court held:
 "[A]s the undisputed testimony indicated, the custom in the lending industry is not to check UCC filings for inventory liens when the bank is presented with unrestricted MSO's, CO's, or certificates of title. As . . . Transamerica [did not give] notice of [its] lien on the MSO's or CO's presented to Union Bank, this Court finds that [Transamerica] is estopped from contending that they have a security interest superior to that of Union Bank and that they waived any right to claim a superior security interest. General Electric Credit Corp. v. Strickland Div. of Rebel Lumber Co., 437 So.2d 1240 (Ala. 1983); Mazer v. Jackson Ins. Agency, 340 So.2d 770 (Ala. 1976); Givens v. General Motors Acceptance Corp., 56 Ala. App. 561, 324 So.2d 277 (1975). Moreover, even if Union Bank *Page 1302 
had made a UCC search, it would have found no filing mentioning Wright's Leasing."
On appeal, Transamerica argues that it is not estopped from asserting its alleged security interest in the six vehicles.
The trial court's finding that industry custom estops Transamerica from asserting its alleged prior security interest is based on its reading of Ala. Code 1975, § 7-1-205, which concerns the effect of "usage of trade" on the contractual rights of parties. Thus, in order to resolve this issue, a review of the both the caselaw cited in the trial court's order and the relevant portions of Alabama's version of the Uniform Commercial Code is necessary.
While the cases cited in the trial court's order concern the issue of estoppel, they do not hold that a creditor who "floor plans" inventory for an automobile dealership is estopped from asserting a security interest where it has released unrestricted CO's and MSO's to the dealership. SeeGeneral Electric Credit Corp. v. Strickland Div. of RebelLumber Co., 437 So.2d 1240 (Ala. 1983) ("floor plan" creditor with perfected security interest in after-acquired inventorynot estopped from asserting its security interest where it had not disclosed to consignor of inventory its security interest);Mazer v. Jackson Ins. Agency, 340 So.2d 770 (Ala. 1976) (property developer estopped from developing buffer zone where it had failed to inform parties to agreement that original agreement was not permanent agreement); Givens v. GeneralMotors Acceptance Corp., 56 Ala. App. 561, 324 So.2d 277
(Ala.Civ.App. 1975) (defaulting debtor waived right to assert right in payments allegedly misapplied to debt where, after notice of alleged misapplication, debtor took no action).
In looking to the Uniform Commercial Code, we note first that Article 9 of the Code — "Secured Transactions" — (Ala. Code 1975, § 7-9-302) requires that a financing statement be filed to perfect a security interest in an automobile that is inventory held for resale by one in the business of selling goods of the kind. In this case, however, the trial court held that Transamerica's failure to observe the custom in the industry — to note its security interest on CO's and MSO's — estops it from arguing that it has a prior perfected security interest in the six vehicles.
The Uniform Commercial Code, Ala. Code 1975, § 7-1-205, defines "usage of trade" and explains its effect on the rights of parties. It states in pertinent part:
 "(2) A usage of trade is any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question. The existence and scope of such a usage are to be proved as facts. If it is established that such a usage is embodied in a written trade code or similar writing the interpretation of the writing is for the court.
 "(3) A course of dealing between parties and any usage of trade in the vocation or trade in which they are engaged or of which they are or should be aware give particular meaning to and supplement or qualify terms of an agreement.
 "(4) The express terms of an agreement and an applicable course of dealing or usage of trade shall be construed wherever reasonable as consistent with each other; but when such construction is unreasonable, express terms control both course of dealing and usage of trade and course of dealing controls usage of trade."
It is obvious from a reading of § 7-1-205 that its provisions concerning the effect of "usage of trade" in an industry are relevant to subsequent dealings between parties who are bound by the express terms of a contractual agreement. It is equally obvious that the language in § 7-1-205 is not intended to aid in determining the outcome of a dispute between parties who are not in any way contractually bound to each other. Section7-1-205(2) defines "usage of trade." Subsection (3) of §7-1-205 provides that a "usage of trade" in an industry gives meaning to and supplements the "terms of an agreement." Clearly, this indicates that the provisions of § 7-1-205 are intended to aid in resolving disputes *Page 1303 
between parties to a contract, but that the provisions of § 7-1-205 are not intended to apply to situations, such ashere, where the parties to a dispute are not mutually bound by contract. Section 7-1-205(4) states that a "usage of trade" should be construed consistently with the terms of an agreement, but that, if such a construction is not possible, the express terms of the agreement control "usage of trade." Again, the language of the statute reveals that a "usage of trade" in an industry should supplement the terms of an agreement. Moreover, by adopting § 7-1-205, the legislature intended to reject cases that see evidence of a "custom" as representing an attempt to displace or negate "established rules of law." § 7-1-205 (Official Comment 4).
In deciding the estoppel issue, we also note the decision of the Supreme Court of Utah in Draper Bank Trust Co. v.Lawson, 675 P.2d 1174 (Utah 1983). In that case, General Motors Acceptance Corporation "floor planned" an automobile dealership's inventory and took a security interest therein. GMAC properly filed a financing statement, noting its security interest in the inventory. Subsequently, one of the dealership's partners sought a loan of $30,000 from Draper Bank. Unaware of GMAC's security interest in the dealership's inventory, Draper Bank approved the loan and took MSO's for three vehicles as security for the loan. For reasons not stated, GMAC repossessed the three vehicles. Draper Bank sued, claiming a superior interest in the vehicles.
Draper Bank argued that GMAC should be estopped from asserting its security interest in the vehicles. The Supreme Court of Utah addressed the issue as follows:
 "Draper Bank's second argument, that GMAC should be estopped because it allowed [the dealership] to have possession of the MSOs, is also without merit. Draper Bank asserts that if GMAC wished to retain a security interest in the vehicles, it should have obtained possession of the MSOs, or at least noted its security interest on the MSOs by a restrictive endorsement. Draper Bank cites only pre-U.C.C. cases in support of this argument.
 "Under the U.C.C., MSOs are not documents of title. § 70A-1-201(15); Nationwide Mutual Insurance Co. v. Hayes, 276 N.C. 620, 174 S.E.2d 511 (1970); Medico Leasing Co. v. Smith, Okla., 457 P.2d 548
(1969); National Exchange Bank v. Mann, 81 Wis.2d 352, 260 N.W.2d 716 (1978); In re Emergency Beacon Corp., 665 F.2d 36 (2d Cir. 1981); In re Foster, 445 F. Supp. 949 (N.D.Okla. 1978); Semple v. State Farm Mutual Auto. Insurance Co., 215 F. Supp. 645
(E.D.Pa. 1963). Therefore, possession of an MSO is neither an indication that one has exclusive control of a vehicle, nor that no liens exist on the vehicle. As stated above, a security interest in an inventoried motor vehicle must be perfected by a U.C.C. filing, not by obtaining possession of the MSO or a restrictive endorsement on the MSO. Draper Bank had the responsibility in this case to check the U.C.C. filings before it assumed that no liens existed on the vehicles."
675 P.2d at 1178.
Thus, we hold that Transamerica is not estopped from arguing that it has a prior security interest in the six vehicles.
Likewise, Transamerica did not waive its right to assert any security interest that it might have had in the six vehicles. See Bates v. Jim Walter Resources, Inc.,418 So.2d 903 (Ala. 1982).
 II.
Transamerica argues that the trial court erred in holding that, pursuant to Ala. Code 1975, § 7-9-307(1), Wright Leasing was a buyer in the ordinary course of T W's business. It argues that Tom Wright did not satisfy the elements of a buyer in the ordinary course of business. To resolve this issue, we must recite the facts concerning the transfer of the six vehicles to Wright Leasing.
The security agreement provided that Transamerica be paid immediately for vehicles sold by T W and financed by Transamerica: *Page 1304 
 "Debtor agrees to pay [Transamerica] the amount of any extension of credit on each item of inventory consisting of Vehicles financed hereunder immediately upon the sale thereof."
Edward Price testified that Transamerica expected payment for a sold vehicle "shortly after" T W sold the vehicle. Price said that he knew when T W sold a vehicle because Wright "would call, . . . tell [him] that he had sold a vehicle, and request the CO and MSO" for that vehicle.
It is undisputed that the six vehicles made the basis of this appeal were sold to T W and financed by Transamerica on the following dates: vehicle 7211 on May 29, 1987; vehicle 1651 on June 5, 1987; vehicle 9574 on July 7, 1987; vehicle 8718 on September 8, 1987; vehicle 5035 on April 28, 1988; and vehicle 3183 on May 23, 1988.
The evidence concerning the dates on which Transamerica was notified that T W had sold the six vehicles and the dates on which it sent the ownership documents to T W are conflicting. Union Bank contends that Transamerica sent both the CO's and the MSO's for the vehicles to T W at least before the date of the transfer of the vehicles to Wright Leasing. Transamerica argues that Tom Wright informed it on January 9, 1989, that it had sold all six vehicles, and that, at that time, it sent to T W the CO's, not the MSO's, for each vehicle because it never had the MSO's in its possession.
Shirley Biegalski, the wholesale cashier for Transamerica, testified for Transamerica. Portions of her testimony were based on records that she said were kept in the ordinary course of her employment. She stated that Transamerica would generate a "trust receipt" for each vehicle it financed, and that it would attach to the trust receipt the CO and MSO for that vehicle. Both Price and Ms. Biegalski said that, once the sale of a vehicle had been arranged, Transamerica would release both the CO and MSO for that vehicle to its seller (T W). Ms. Biegalski stated that when it did so, it would retain the trust receipt for that vehicle, note thereon the date on which the CO and MSO were released, and attach a copy of the CO and MSO to the trust receipt. She said that Transamerica would retain the trust receipt until it had been paid in full for the subject vehicle.
Price testified that Tom Wright contacted him on or about January 9, 1989, and told him that he had sold all six of the vehicles. Price stated that at that time he instructed Ms. Biegalski to send the CO's and MSO's for the six vehicles to T W. Transamerica introduced into evidence a trust receipt for each of the six vehicles it financed for T W. On each trust receipt, the date "January 9" was written. Ms. Biegalski testified that "January 9" denoted the date on which she released to T W the CO's for the six vehicles.
Both Price and Ms. Biegalski stated that ordinarily limousine manufacturers issue both CO's and MSO's for vehicles they manufacture; however, they said, some limousine manufacturers did not issue MSO's for their vehicles. Ms. Biegalski said she thought that, at the time the vehicles made the basis of this appeal were manufactured, Hess 
Eisenhardt, the manufacturer of five of the six vehicles, did not issue MSO's on vehicles. In any event, Price testified that, at the time of trial, he knew that Transamerica had the CO's in its possession, and that Ms. Biegalski released them to T W on January 9, 1989; he could not say that Transamerica had possession of the MSO's on January 9, 1989. Price said that his testimony was based on records kept in a log book by Ms. Biegalski. Ms. Biegalski said that she released only the CO's to T W, but that, had she had them, she would have sent both the CO's and MSO's to T W.
Transamerica introduced copies of the CO's and MSO's into evidence.[4] It is not disputed, and the MSO's, which were signed by Tom Wright, note, that the vehicles thereon described were transferred from T W to Wright Leasing on the *Page 1305 
following dates: vehicle 7211 on July 27, 1987; vehicle 1651 on August 10, 1987; vehicle 9574 on October 10, 1987; vehicle 8718 on June 21, 1988; vehicle 5035 on June 27, 1988; vehicle 3183 on May 9, 1989. (For vehicle 3183, the date of transfer is noted on the CO.) Tom Wright testified that, "to the best of his knowledge," the transfer dates noted on the MSO's and CO were correct.
Transamerica introduced several other documents indicating that it released the ownership documents on January 9, 1989.
It produced an excerpt from a log book kept by Ms. Biegalski containing the status of released CO's and MSO's. The log book noted that Transamerica released the ownership documents[5] for the six vehicles on January 9, 1989.
Transamerica introduced a "sender's copy" of a receipt for an express mail package dated January 9, 1989, sent to Tom Wright by Ms. Biegalski.
Transamerica also introduced a copy of a form letter Ms. Biegalski sent to Tom Wright and T W on February 1, 1989, stating the following:
 "May we take this opportunity to confirm with you our record of outstanding MSO's and titles in your possession as of this date. . . . Remittance of payment in full or confirmation is needed at this time."
The letter then states that the "MSO's" [6] for the six vehicles have been outstanding since their release on January 9, 1989.
Transamerica introduced seven monthly inventory reports. The security agreement provided Transamerica the right to inspect the vehicles it had financed. Bill Thompson, Transamerica's district sales representative for Montgomery, testified that he performed monthly physical inspections of collateral financed by Transamerica for T W, and that, based on his inspection of T W's inventory, he would prepare "dealer monthly inventory records." The seven dealer monthly inventory records introduced by Transamerica span the period February 11, 1988, to May 24, 1989. All of the records note that, at that time they were completed, vehicles 7211, 1651, and 9574 had not been sold by T W. The three dealer monthly inventory records dated last in time note that, at the time they were completed, all six vehicles made the basisof this appeal had not been sold by T W. Under the space provided for the dealer's signature on dealer monthly inventory records, the following language appears:
 "This report has been carefully read and is accepted as complete and current in every detail."
In any event, it is not disputed that the dealer monthly inventory records were signed by either Tom Wright or Hillard Wright, a T W employee and Tom Wright's brother, and that, by signing them, they verified the records' accuracy. Thompson testified that at no time did either Tom or Hillard Wright inform him that they had transferred any of the six vehicles to Wright Leasing.
Tom Wright testified that he had no independent knowledge of when he received the CO's from Transamerica. He said he relies on the MSO's to know when T W transferred the vehicles to Wright Leasing; that he relies on the Union Bank notes to know when he borrowed the purchase money for the vehicles; and that he relies on the dealer monthly inventory records to know what vehicles he represented to have been sold and those he represented not to have been sold. Tom Wright testified that he had intended to pay Transamerica the money T W owed it for each of the six vehicles.
The Union Bank notes indicate, and it is not disputed, that Union Bank lent Wright *Page 1306 
Leasing the purchase money for the vehicles on the following dates: for vehicle 7211 on March 4, 1988; for vehicle 1651 on November 1, 1987; for vehicle 9574 on March 4, 1988; for vehicle 8718 on June 21, 1988; for vehicle 5035 on June 20, 1988; and for vehicle 3183 on August 14, 1989.
William Johnson, senior vice-president of Union Bank, testified for Union Bank. He said that, to lend money to one purchasing a limousine or a hearse, Union Bank required the purchaser (Wright Leasing) to release both the CO and the MSO for that vehicle to Union Bank. Johnson stated that he had possession of both the CO and the MSO for each vehicle at the time Union Bank lent the purchase money for each vehicle to Wright Leasing. However, he acknowledged that, unlike the MSO's for all the vehicles, the CO's for five of the six vehicles did not have the transfer from T W to Wright Leasing recorded thereon; that only the CO for vehicle 3183, which was the only vehicle T W stated was transferred to Wright Leasing after January 9, 1989, had recorded on it the transfer from T W to Wright Leasing. Johnson admitted that he did not attempt to determine whether the six vehicles were subject to a security interest. He also testified that Union Bank perfected its security interest in two of the six vehicles.
The evidence in this case was presented ore tenus. Thus, this Court must presume that the findings of the circuit court based on that evidence are correct. However, no presumption of correctness as to findings of fact will be indulged on review when ore tenus evidence was not presented, and in such a case it is our duty to sit in judgment of the evidence. Tate v. Kennedy, 578 So.2d 1079 (Ala. 1991); McCullochv. Roberts, 292 Ala. 451, 296 So.2d 163 (1974).
Transamerica argues that, pursuant to Ala. Code 1975, § 7-9-306(2), it has a security interest in the six vehicles, notwithstanding their sale. Section 7-9-306(2) states:
 "Except where this article otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof unless the disposition was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor." (Emphasis added.)
Union Bank relies on an exception to the protection afforded in § 7-9-306(2). The exception, found in § 7-9-307(1), provides:
 "A buyer in ordinary course of business (subsection (9) of section 7-1-201) . . . takes free of a security interest created by his seller even though the security interest is perfected and even though the buyer knows of its existence."
See Frank Davis Buick AMC-Jeep, Inc. v. First Alabama Bank ofHuntsville, N.A., 423 So.2d 855 (Ala.Civ.App. 1982).
Transamerica argues, and we agree, that Union Bank, as the party claiming that Wright Leasing is a "buyer in the ordinary course of business," bears the burden of proving that Wright Leasing is such a buyer. See American National Bankv. Cloud, 201 Cal.App.3d 766, 247 Cal.Rptr. 325 (1988); Coxv. Bancoklahoma Agri-Service Corp., 641 S.W.2d 400
(Tex.Dist.Ct.App. 1982); International Harvester Co. v.Glendenning, 505 S.W. 2d 320 (Tex.Civ.App. 1974). Based on our application of the Uniform Commercial Code to the facts of this case, we hold that the trial court erred in finding that Wright Leasing was a buyer in the ordinary course of T W's business.
A buyer in the ordinary course of business is defined as follows:
 "[A] person who in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party in the goods buys in ordinary course from a person in the business of selling goods of that kind. . . ."
Ala. Code 1975, § 7-1-201(9) (emphasis added).
Transamerica concedes that if Union Bank can prove that Wright Leasing satisfies the elements of a "buyer in the ordinary course of business," then its debtor, Wright Leasing, is entitled to take the vehicles *Page 1307 
free of Transamerica's security interest created in it by Tom Wright and T W. Transamerica admits that Tom Wright and T 
W are in the business of selling goods of the kind (limousines and hearses). However, it argues that the trial court erred in holding that Union Bank met its burden with respect to the remaining elements of a buyer in the ordinary course of business. Transamerica argues that Union Bank failed to prove that Wright Leasing's purchase of the vehicles was in good faith; that Wright Leasing acted without knowledge that its conduct was in violation of the security agreement; and that Wright Leasing's purchase was in the ordinary course of T W's business. See § 7-1-201(9). Because we find that Wright Leasing acted with knowledge that its conduct was in violation of the security agreement, and that such a finding is alone sufficient to require reversal, we will limit our discussion to that element.
Transamerica argues that Wright Leasing acted in knowing violation of the security agreement for two reasons. First, it argues that Tom Wright's failure to immediately seek a loan to pay for the transfers of four of the vehicles was in violation of the security agreement. We agree.
The security agreement provides in pertinent part:
 "Debtor agrees to pay Secured Party the amount of any extension of credit on each item of inventory consisting of Vehicles financed hereunder immediately upon the sale thereof." (Emphasis added.)
The trial court based its holding that Wright Leasing was a buyer in the ordinary course of business on the fact that it found that, at the time the vehicles were transferred to Wright Leasing, T W intended to pay Transamerica the amount it owed on the vehicles. However, the evidence does not support the trial court's finding. Tom Wright testified that he had no independent memory of the individual transactions, and that his testimony was based on the relevant documents that were submitted to the trial court. Based on the transfer dates listed on the MSO's, four of the vehicles were transferred from T W to Wright Leasing on the following dates: vehicle 7211 on July 27, 1987; vehicle 1651 on August 10, 1987; vehicle 9574 on October 10, 1987, and vehicle 3183 on May 9, 1989. Union Bank's records indicate, and it is not disputed, that Wright Leasing borrowed the purchase money for vehicles 7211, 1651, 9574, and 3183 on March 4, 1988, November 1, 1987, March 4, 1988, and August 14, 1989, respectively. Tom Wright testified that he knew, based on the terms of the security agreement, that T W was obligated to pay Transamerica immediately for any vehicles financed by Transamerica and sold by T W. There was no evidence that Tom Wright and Wright Leasing had any difficulty in obtaining purchase money loans from Union Bank. Indeed, the evidence indicates that Wright Leasing obtained numerous purchase money loans from Union Bank. Thus, Tom Wright, and, therefore, Wright Leasing, knew as of the date of the transfers of those four vehicles that the sales thereof were in violation of the security agreement between T W and Transamerica. Thus, as to vehicles 7211, 1651, 9574, and 3183, Wright Leasing was not a buyer in the ordinary course of business.
Transamerica also argues that Tom Wright and Wright Leasing knew that T W violated the security agreement by failing to note on the dealer monthly inventory records that it transferred the six vehicles to Wright Leasing. Union Bank argues that because Transamerica was aware of the sales of the vehicles prior to the dates on which the dealer monthly inventory records were made, the records have no relevance to the issue whether Wright Leasing was a buyer in the ordinary course of business. Again, we disagree.
The trial court found that Transamerica sent both the CO's and the MSO's to T W "prior to the time the loans were made by Union Bank and that such CO's and MSO's were in Union Bank's possession at the time the loans were made." Thus, the trial court found that Transamerica released the CO's and MSO's
for five of the six vehicles to T W before January 9, 1989, the date *Page 1308 
that Transamerica claims it released the CO's to T W.
As we have stated, Tom Wright testified that he had no independent memory of when he informed Transamerica that T 
W had sold the vehicles to Wright Leasing. He said that he relied on the documents to determine at what time Transamerica learned of the sales. Union Bank presented no documentary evidence supporting the conclusion that Transamerica was aware of the transfers at the time they were alleged to have occurred. The MSO for each vehicle merely notes thereon the date T W transferred the vehicle to Wright Leasing.
Transamerica presented both oral testimony and documentary evidence tending to prove that it never had the MSO's to release to T W and that it released the CO's for the six vehicles to T W on January 9, 1989. The oral testimony consisted of the testimony of Edward Price and Shirley Biegalski that Transamerica never had the MSO's for the six vehicles; that T W informed Transamerica of the sale of the vehicles on January 9, 1989; and that, at that time, Transamerica released to T W the CO's to the vehicles. Price admitted that his testimony was based on the records kept by Transamerica. Ms. Biegalski said she remembered receiving a request for release of the ownership documents in early 1989 because, she said, it was unusual to receive a request for the release of ownership documents for six vehicles at one time, although on cross-examination she was unable to identify the debtor and the date in a similar transaction listed in Transamerica's log book.
The documentary evidence introduced by Transamerica tending to prove that Transamerica became aware of the transfer of the six vehicles on January 9, 1989, and that it released the CO's to T W on that date, consists of the following: the trust receipts for each vehicle, noting January 9 as the release date; the express mail receipt of the same date; the form letter of February 1, 1989; and the log book, listing the release date of the ownership documents for each vehicle as January 9. The only documents generated by T W that bear on the issue are the dealer monthly inventory records; they indicate that as late as May 1989 T W had not sold the six vehicles. It is also notable that the only CO to have recorded thereon the transfer from T W to Wright Leasing is the CO for vehicle 3183, the only vehicle that was undisputedly transferred to Wright Leasing after January 9, 1989.
Because Union Bank presented no ore tenus evidence tending to prove that Transamerica sent to T W the CO's and MSO's before Union Bank lent Wright Leasing the purchase money for each of the six vehicles, we can not indulge a presumption of correctness in the trial court's finding to that effect. Based on the only relevant oral testimony, and on the documentary evidence introduced, we hold that Union Bank has not met its burden of proving that Transamerica was aware of the transfers of the vehicles before January 9, 1989. Thus, Union Bank's argument — that the dealer monthly inventory records are irrelevant to the issue whether Wright Leasing was a buyer in the ordinary course of business because Transamerica was already aware of the transfers — fails. Therefore, we now determine whether the dealer monthly inventory records were kept in violation of the security agreement.
The security agreement provides in pertinent part:
 "The following shall constitute default under this Agreement:
 "Misrepresentation by [T W] to [Transamerica] in connection with the business and financial condition or organizational structure of [T W] or any misrepresentation relating to the Collateral. . . ." (Emphasis added.)
The dealer monthly inventory records were signed by either Tom or Hillard Wright. As late as May 24, 1989, T W verified in a dealer monthly inventory record compiled by Bill Thompson, Transamerica's district sales representative for Montgomery, that all of the vehicles were in the possession of T W. Such a misrepresentation relating to T 
W's collateral is clearly a violation of the security agreement. Tom Wright testified that the *Page 1309 
information on the dealer monthly inventory records could have been supplied by either him or his brother, Hillard Wright. We hold that the evidence presented tends to prove that Tom Wright, and, therefore, Wright Leasing, was aware of the security agreement violations.
One dealer monthly inventory report, compiled on August 19, 1988, indicates that, at that time, all six vehicles were possessed by T W. At that time, which was before January 9, 1989, T W had transferred five of the six vehicles to Wright Leasing: vehicles 7211, 1651, 9574, 8718, and 5035. Thus, as to the purchase of those five vehicles, Union Bank failed to prove that Wright Leasing was a buyer in the ordinary course of business; indeed, the evidence tended to prove that Wright Leasing was not a buyer in the ordinary course of business.
Having previously held that Union Bank failed to prove that the sale of the sixth vehicle to be sold, vehicle 3183,[7] was not in violation of the security agreement, we hold that the trial court erred in finding, as to the sale of all six vehicles, that Wright Leasing was a buyer in the ordinary course of business. Because we so hold, we pretermit discussion of Transamerica's argument that Union Bank failed to prove that the transfer of the vehicles to Wright Leasing was in good faith and that it was in the ordinary course of T W's business.
The judgment of the trial court is reversed and the cause is remanded for entry of a judgment consistent with this opinion.
REVERSED AND REMANDED.
HORNSBY, C.J., and SHORES, HOUSTON, STEAGALL and INGRAM, JJ., concur.
[1] Formerly Borg-Warner Acceptance Corporation.
[2] Edward Price, Transamerica's "division control manager" for Montgomery, testified that a certificate of origin is a certificate of the origin of a chassis of an automobile. A manufacturer's statement of origin, he stated, is a statement of the origin of a vehicle that has been converted into either a limousine or a hearse by the conversion manufacturer. Ordinarily, a certificate of origin is issued for an automobile; however, Price said, both a certificate of origin and a manufacturer's statement of origin are issued for limousines and hearses. Price testified that, in regard to a limousine or a hearse, a certificate of origin and a manufacturer's statement of origin are the documents that indicate ownership of the vehicles prior to the time of the issuance of a certificate of title.
[3] Transamerica admits that it sent the CO's for the vehicles to T W. However, it denies it ever had possession of, or that it sent, the MSO's to T W. See part II, infra.
[4] Transamerica does not explain how, if it did not have possession of the MSO's on January 9, 1989, it came into possession of the MSO's for purposes of this appeal.
[5] Although Transamerica states that it released only the CO's for the six vehicles, the log book is entitled "Released MSO's." Ms. Biegalski accounts for this as follows: "[W]e just consider everything an MSO. We don't distinguish usually the difference. We know the difference, but we just refer to them as MSO's."
[6] See footnote 5, for Ms. Biegalski's testimony concerning Transamerica's reference to the ownership documents as "MSO's."
[7] Along with vehicles 7211, 1651, and 9574.