## In re CERTAIN PHARMACEUTICALS AND PROCEEDINGS OF NORTHLAND PROVIDERS, INC., and/or Lakeside Medical Supply, Inc.

### Misc. No. 99–22 (DSD/RLE).

United States District Court, D. Minnesota.

Oct. 28, 1999.

---

Glen E. Davis, Palos Hills, IL, Shawn W. Dunlevy, Duluth, MN, for D&K.

Janice M. Symchych, Minneapolis, MN, for Cardinal Health.

ORDER

DOTY, District Judge.

Based upon the Report and Recommendation of United States Magistrate Judge Raymond L. Erickson, and after an independent review of the files, records and proceedings in the above-titled matter, it is—

ORDERED:

That D & K's Motion for Return of Property [Docket No. 2] is granted, and the pharmaceuticals in question, and any proceeds from their Court-authorized sale, is to be distributed to D & K.

## REPORT AND RECOMMENDATION

ERICKSON, United States Magistrate Judge.

At Duluth, in the District of Minnesota, this 5th day of October, 1999.

### I. *Introduction*

This matter came before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. § 636(b)(1)(A), upon the Motion of D & K Healthcare Resources, Inc. ("D & K"), for the return of property, pursuant to Rule 41(e), Federal Rules of Criminal Procedure, that was seized during a federally warranted search.

Following the completion of several preliminary Hearings, an Evidentiary Hearing on the Motion was conducted on August 26, 1999, at which time, D & K appeared by Glenn E. Davis and Shawn W. Dunlevy, Esqs., and Cardinal Health ("Cardinal"), which has submitted a claim to the property in question, appeared by Janice M. Symchych, Esq. No appearances were made by Candi Creamer, or Lakeside Medical Supply, Inc. ("Lakeside"), whose previous claims to the property have been withdrawn. For reasons which follow, we recommend that the property at issue, and any proceeds from the prior sale or other disposition of that property, be distributed to D & K.

### II. *Procedural and Factual Background*

The Government seized certain pharmaceuticals, which were in the possession of Lakeside, through the execution of Federal Search Warrants. Purportedly, the pharmaceuticals had been transferred to Lakeside from Northland Providers, Inc. ("Northland"). The pharmaceuticals were time-sensitive and, therefore, their medical and, *a fortiori*, their commercial worth, could have been rendered valueless if they were not promptly marketed. On the Record before us, the pharmaceuticals had been sold to Northland, and were subject to a perfected security interest, which had been executed by Northland in favor of D & K. As noted, neither Northland, nor Lakeside, opposed D & K's Motion to recover the pharmaceuticals, or the proceeds from their sale, at the time of the Evidentiary Hearing.

Following our Order of June 3, 1999, which allowed D & K to sell the pharmaceuticals, so as to maximize their value prior to any expiration of their effective date, Cardinal filed a claim, on June 22, 1999, to any proceeds which would be recovered by that sale. According to Cardinal, the assets of Northland are subject to a Writ of Execution that was based upon a Judgment obtained by Cardinal against Northland. In addition, Cardinal argues that any funds, which were possessed by Lakeside, and which were owed to Northland, are subject to a Garnishment Summons which Cardinal has served upon Lakeside. Given the parties' respective procedural postures, we recount the operative facts.

· D & K is a regional, wholesale distributor of pharmaceuticals which engaged in a series of transactions involving the sale of pharmaceuticals to Northland. See, *D & K's Verified Motion for Return of Property*, at 1. Cardinal is a wholesale distributor of pharmaceuticals which also sold pharmaceuticals to Northland on account. See, *Cardinal Health's Hearing Memorandum*, at 1. Lakeside is, purportedly, a Minnesota Corporation which is alleged to have received pharmaceuticals that are claimed to have been transferred from Northland. See, *Cardinal Health's Hearing Memorandum*, at 2. Cardinal and D & K dispute several key aspects of the alleged transactions which resulted in Lakeside's possession of the pharmaceuticals in question.

D & K contends that the transactions between Northland and Lakeside were not

sales in the "normal course of business" but, rather, were transactions that constitute an illegal diversion. See, *D & K's Verified Motion for Return of Property*, at 4. D & K alleges that such a diversion may well have been taken in order to remove the pharmaceuticals from the reach of D & K. The details of Lakeside's incorporation are of little benefit in addressing the entitlement of D & K, or Cardinal, to the property in contest, as the documents evince Lakeside's incorporation, under the laws of Minnesota, and little else. For example, the documents do nothing to illuminate how the pharmaceuticals were legally transferred—if, indeed they were—from Northland to Lakeside. They do suggest a close relationship, however, between the incorporators of Lakeside, and of Northland, which could have facilitated the type of illegal diversion to which D & K has alluded.

On or about February 26, 1999, the FBI executed a Search Warrant on Lakeside, and seized the pharmaceuticals which are the subject of this action. See, *Cardinal Health's Hearing Memorandum*, at 2. The seizure was effected as a part of an investigation, by the United States Attorney for the District of Minnesota, into the activities of Northland, and associated individuals and entities. See, *D & K's Verified Motion for Return of Property*, at 1. At the time that the Government took possession of the pharmaceuticals, Northland owed D & K in excess of $1,000,000 for prior pharmaceutical purchases. This debt was secured by an Inventory Purchase Money Security Agreement that is dated May 12, 1998. See, *D & K's Verified Motion for Return of Property, Attached Exhibit B* . D & K perfected its security interest in Northland's inventory by filing, on June 9, 1998, a Uniform Commercial Code Financing Statement with the Minnesota Secretary of State. See, *D & K's Verified Motion for Return of Property, Attached Exhibit C.*

On March 5, 1999—after the seizure of the drugs in question, and as a result of Northland's inability to pay the debt owed by Northland to D & K, a Voluntary Surrender Agreement was executed by Northland in favor of D & K. See, *D & K's Verified Motion for Return of Property, Attached Exhibit E.* This Surrender Agreement granted D & K the right to the immediate recovery of all inventory pledged to D & K as security by Northland, and all proceeds derived from the sale of D & K's pharmaceuticals which were included in Northland's inventory. *Id.*

D & K now contends that Lakeside may be the alter ego of Northland, which was formed for illegal purposes. See, *D & K's Verified Motion for Return of Property*, at 3. Further, D & K challenges the existence of a legitimate sale of pharmaceuticals from Northland to Lakeside. *Id.* If either of these assertions is correct, then, as D & K contends, their security interest would prevail over other claims, thereby entitling them to the proceeds from the sale of the property. *Id.* In the alternative, D & K also argues that, if the sale of the pharmaceuticals from Northland to Lakeside were, in fact, a legitimate transaction, then D & K would remain a superior interest holder, over other claimants, by virtue of the Surrender Agreement. *Id.*

In contrast, Cardinal bases its claim to these same proceeds on its position as a Judgment Creditor of Northland. On March 18, 1999, Cardinal brought suit against Northland for the nonpayment of a debt that was owed to Cardinal for previous goods sold. See, *Cardinal Health's Hearing Memorandum*, at 1. On June 25, 1999, the Minnesota District Court entered Judgment for Cardinal, and against Northland, in the amount of $146,112.30. *Id.* Subsequently, on August 19, 1999, Cardinal is purported to have served Lakeside with a Garnishment Summons. See, *Cardinal's Supplemental Memorandum, Attached Affidavit of Holly E. Schwartz*, at ¶ 2. The legality of that purported service has been challenged by D & K. See, *Response of D & K to Cardinal's Supplemental Memorandum.* On September 7, 1999, the Ramsey County Sheriff's Department

served a Writ of Execution upon Lakeside, by serving Lakeside's then legal counsel, Melissa Fraser, Esq. See, *Supplemental Affidavit of Holly E. Schwartz.*

According to Cardinal, its status as a Judgment Creditor grants it a superior, priority status over that of D & K. Cardinal bases this assertion on its contention that the alleged transfer of the pharmaceuticals, from Northland to Lakeside, was a sale "in the normal course of business." See, *Cardinal Health's Hearing Memorandum,* at 4–5. Under the Uniform Commercial Code, Lakeside's status as a "good faith buyer," in the "ordinary course of business," would destroy D & K's right to the proceeds of the pharmaceuticals, which was obtained as a consequence of D & K's perfected security interest. See, *Minnesota Statutes Section 336.9–307(1).* Cardinal contends that D & K bears the burden to demonstrate that the transfer, from Northland to Lakeside, was not a sale in the ordinary course of business, if D & K is to maintain its security interest in the proceeds from the sale of the pharmaceuticals. See, *Cardinal Health's Hearing Memorandum,* at 4. According to Cardinal's legal theory, if the transfer of the pharmaceuticals were a sale in the ordinary course of business, then the proceeds of the sale should rightfully go to Lakeside. As urged by Cardinal, its status as a Judgment Creditor of Northland, and as a garnishor of Lakeside, should thereby entitle it to those proceeds. *Id.* In the alternative, Cardinal argues that, if the Court rejects Lakeside as the proper party to receive those proceeds, because of Lakeside's prior renunciation of a right to the pharmaceuticals, then Cardinal should retain an interest in Lakeside's assets, superior to that of D & K, based upon Cardinal's Garnishment Summons, and the assertedly legitimate purchase of those pharmaceuticals, from Northland, by Lakeside. *Id.*

At the Hearing, the evidence adduced by D & K establishes D & K's legitimate right to the proceeds in question as a result of its perfected security interest. In support of its claim, D & K offered its Purchase Money Security Agreement of May 12, 1998, with Northland. Paragraph 5 of that Agreement states, in part, as follows:

> The Inventory, or any part thereof, will not be sold, transferred or disposed of, except in the normal course of business *** unless seller consents in advance in writing ***.

See, *D & K's Verified Motion for Return of Property, Attached Exhibit B.*

At the Hearing, Charles Levy ("Levy"), who is the Vice President of Financial Services for D & K, testified that this Agreement was specifically intended to prevent customers, such as Northland, to transfer the drugs unlawfully. According to Levy, Northland made representations to D & K that their normal business was to sell pharmaceuticals only to "closed door" pharmacies.

A "closed door" pharmacy is one which does not distribute drugs to the public at large but, rather, limits its sales to nursing homes, and private care facilities. Since the "closed door" pharmacy is not allowed to resell D & K's drugs on the open market—as reflected by the language of Paragraph 5 of the Security Agreement—D & K sells pharmaceuticals to such pharmacies on a substantially less than retail market price basis. Understandably, D & K prohibits "closed door" pharmacies from reselling any drugs purchased from D & K, in order to maintain the general market price of the pharmaceuticals which are generally available to the public at large. As recounted by Levy, any sale to the retail drug market would not be an "ordinary business" transaction by Northland and, more importantly, the transfer of pharmaceuticals, from Northland to Lakeside, was not authorized, at any time, by D & K, as required by Paragraph 5 of D & K's Security Agreement with Northland, which we have quoted above.

Lastly, Levy testified that Northland's representatives assured D & K that Lakeside was not a nursing home, or some other form of "closed door" care facility. Levy's testimony was not controverted, in any appreciable way, by Cardinal. Ac-

cording to Levy, D & K attempted to secure documents from Lakeside which would reveal the nature of Lakeside's business dealings, but those attempts were unsuccessful. As a result, neither Cardinal nor D & K has provided the Court with documentation which would disclose the nature of nature of Lakeside's business dealings, or the details of the transfers of Northland's drugs to Lakeside.[1]

Brad Mattson ("Mattson"), who is a Manager of Customer Services for D & K, also testified at the Hearing. Mattson corroborated Levy's testimony as to the consistency of Northland's representations that it only sold pharmaceuticals to closed door pharmacies. Mattson, further testified about the inventory process, which had been employed by D & K, to identify the pharmaceuticals on the premises of Lakeside as having originated at D & K. According to Mattson, much of the inventory found at Lakeside had "put away labels," or pertinent shipping information, which reflected that D & K was the originator of the inventory. Mattson's investigation of that inventory, however, failed to uncover any documents which revealed the details of the transaction between Northland and Lakeside. Nor did Mattson uncover evidence that any of the drug inventory at Lakeside had originated at Cardinal. In effect, D & K was the only distributor of pharmaceuticals that was identified on any of the drug inventory found on Lakeside's premises, although some of the boxes were unmarked, rendering the source of the drugs undeterminable.[2] On this evidence, the following propositions have been established by evidence that the Court considers to be both competent, and credible:

1. D & K held a perfected security interest in the bulk of Lakeside's drug inventory, which was verified by D & K's conduct of a physical inventory at Lakeside, and this perfected security interest has a priority over Cardinal's claim, unless the transaction between Northland and Lakeside constituted a good faith purchase in the ordinary course of business.

2. There is no evidence as to the nature of the transaction between Lakeside and Northland, which resulted in the possession of drugs, by Lakeside, which originated at D & K, let alone evidence that would so much as suggest that the alleged transaction was either lawful, or conducted in the ordinary course of business.

3. D & K did not authorize any sales of D & K's pharmaceuticals to Lakeside.

4. Northland was solely a "closed door" pharmacy whose ordinary course of business was to sell drugs exclusively to nursing homes and long term care facilities.

5. Cardinal is a Judgment Creditor of Northland, and a Garnishor of Lakeside,[3] by virtue of a June 25, 1999, Minnesota State Court Judgment.

1. During the preliminary proceedings in this matter, the Record discloses that the owners of Northland, and certain of the officers of Lakeside—including Candi Creamer—are suspected, by the United States Attorney for the District of Minnesota, of having engaged in illegal drug diversion activities. While no formal Federal charges have been brought within this District on these suspicions, we generally understand the suspected violations to involve the sale of "closed door" drugs to the general marketplace, at substantially reduced prices. As theorized by D & K, the transfer of the pharmaceuticals, from Northland to Lakeside, may well have been in furtherance of a drug diversion conspiracy. We find no evidence before us, however, that substantiates D & K's theory.

2. The existence, and business dealings of Lakeside, are also something of an enigma. Witnesses for D & K, who had been employed for as much as thirty-three years in the pharmaceutical industry, and who had principally worked in the geographic area surrounding Lakeside's headquarters, had neither dealt with, nor heard of, an entity known as Lakeside. Similarly, Cardinal has offered no suggestion, let alone evidence, which would assist in identifying the nature of Lakeside's business dealings, within or without the pharmaceutical industry.

3. D & K disputes Cardinal's standing as a Garnishor of Lakeside but, because it does not impact upon our analysis of the critical issues

6. There is no evidence that any of the inventory, which was found on Lakeside's premises, originated at Cardinal. Given the Record as a whole, and the foregoing propositions, which we specifically find on that Record, we proceed to analyze the respective claims of D & K and Cardinal.

### III. *Discussion*

This proceeding arises under Rule 41(e), Federal Rules of Criminal Procedure, which provides in pertinent part:

A person aggrieved by an unlawful search and seizure may move the district court for the district in which the property was seized for the return of property on the ground that he is entitled to lawful possession of the property which was illegally seized.

*Rule 41(e), Federal Rules of Criminal Procedure.*

■ Rule 41(e) provides the typical means by which to seek the return of seized property after an Indictment has been issued. However, a Rule 41(e) Motion, by a party who is not subject to criminal charges, is properly considered a suit in equity, rather than an action under the Federal Rules of Criminal Procedure. See, *Matter of Search of 4801 Fyler Avenue,* 879 F.2d 385, 387 (8th Cir.1989), *cert. denied,* 494 U.S. 1026, 110 S.Ct. 1470, 108 L.Ed.2d 608 (1990). Here, an Indictment has not been issued, and none of the parties, who are requesting the return of the property at issue, appear to be involved in the criminal investigation that precipitated the warranted seizure of the pharmaceuticals. As such the Rule 41(e) proceedings are, in practical effect, a civil action to recover personal property. See, *Boyd v. United States Department of Justice,* 673 F.Supp. 660, 661 (E.D.N.Y.1987) (noting that, when there is no criminal case to which movant's Motion could be attached, the Motion is actually civil in nature); *Application of Dr. J.W. Schonfeld, Ltd.,* 460 F.Supp. 332, 334 (E.D.Va.1978).

■ Secured transactions, such as those involving Northland and D & K, are governed by Article 9 of the U.C.C. See, *Minnesota Statutes Sections 336.9–101–.9–508.* Here, because Cardinal has asserted a claim to the property which is the subject of a perfected security interest, we are obligated to determine whether Cardinal, or D & K, has a superior interest in the property, using the rules of priority established by Article 9. According to Section 9–201 of the U.C.C., "a security agreement is effective according to its terms between the parties, against purchasers of the collateral and against creditors." *Minnesota Statutes Section 336.9–201.* Here, D & K contends that it possessed a perfected purchase money security interest in the pharmaceuticals that were seized at Lakeside's place of business. As noted, Cardinal contends that these pharmaceuticals were transferred to Lakeside, by Northland, in the "ordinary course of business."

A security interest is said to attach when it "becomes enforceable against the debtor with respect to the collateral." See, *Minnesota Statutes Section 336.9–203(2).* Attachment occurs when the following conditions are met: (1) the debtor has signed a security agreement describing the collateral; (2) value has been given; and (3) the debtor has rights in the collateral. See, *Minnesota Statutes Section 336.9–203(1), (2).* A secured party, whose interest has attached, may enforce that interest against the debtor, or third parties, with respect to the subject collateral. *Minnesota Statutes Section 336.9–203(1).* Here, a Security Agreement was executed by Northland, in favor of D & K, in May of 1998. This agreement satisfies the requirements of Section 336.9–203, and, therefore, D & K's security interest properly attached in May of 1998. D & K then sought to perfect its interest by filing the required U.C.C.–1 statement with the Minnesota Secretary of State. Generally, a security interest is perfected when it has attached, and when the financing state-

---

* in the matter, we presume that Cardinal's

Garnishment was properly served.

ment is filed. See, *Minnesota Statutes Sections 336.9–302(1), .9–303(1).* Here, D & K's security interest in the pharmaceuticals, which it sold to Northland, was perfected on June 9, 1998.

The U.C.C. makes clear that Judgment Creditors, such as Cardinal, are subordinate to the rights of holders of perfected security interests, such as D & K, who perfect their security interest prior to the time that the lien creditor's rights attach. Under the U.C.C., a lien creditor is a creditor who has acquired a lien on the property involved "*** by attachment, levy, **or the like.**" *Minnesota Statutes Section 336.9–301(3).* The Code further provides that, "a person who becomes a lien creditor while a security interest is perfected takes subject to the security interest ***." *Minnesota Statutes Section 336.9–301(4).* Applicable case law confirms that D & K's security interest has a priority over Cardinal's Judgment lien under the circumstances here presented.

Cardinal's status as a lien creditor, with rights subordinate to the perfected security interest of D & K, is verified by our Court of Appeals' decision in *Sperry Corporation v. Farm Implement, Inc.,* 760 F.2d 196 (8th Cir.1985), which involved facts remarkably similar to those presented here. In *Sperry,* an entity known as "Bush Hog" obtained a Judgment against another entity, known as "Farm Implement," for over thirty thousand dollars. *Id.* at 197. Bush Hog then filed a garnishment action against Sperry, which was a third entity who was indebted to Farm Implement from prior business dealings. In analyzing the competing lien priorities, the Court of Appeals applied Arkansas law, which is identical to the law in Minnesota, as a result of both States having adopted the pertinent sections of the U.C.C., without alteration.

The Court held that, under the Code as adopted in Arkansas, "the holder of an unperfected security interest is subordinate to a person who becomes a lien creditor before the security interest is perfected." *Id.* "This means that the holder

of a perfected security interest takes priority over a subsequent lien creditor under the general Code principle that gives priority to the earliest perfected security interest." *Id.* at 197. Later, in a footnote, the Court observed, "Bush Hog" is a lien creditor pursuant to the terms of section 85–9–301(3) which defines a "lien creditor" as one "who has acquired a lien on the property involved by attachment, levy or the like." *Id.* As noted, the language of Arkansas Statute Annotated Section 85–9–301 is identical to that provided in Minnesota Statute Section 336.9–301(3), which governs our analysis of D & K's, and Cardinal's, claims.

Analogous Court decisions also hold that D & K's prior perfected security interest is superior to a subsequent Judgment lien. For example, in *Slodov v. United States,* 436 U.S. 238, 256, 98 S.Ct. 1778, 56 L.Ed.2d 251 (1978), the Supreme Court determined that, under the Internal Revenue Code, and established Court decisions, tax liens are subordinated to perfected security interests which arise before the filing of the tax lien. In a footnote, the Court explained that, "[u]nder the UCC, a perfected security interest is superior to a judgment lien creditor's claim in the property." *Id.;* citing, *Uniform Commercial Code Sections 9–301, 9–312.*

Of course, the perfection of the security interest serves to solidify the priority which attaches to that interest.

> Interests in property rise and fall according to perfection or nonperfection. The penalties for failure to perfect make for lenders' nightmares and the gleam in lien creditor's eyes. When properly accomplished, however, perfection is the source of great confidence.

Sanford, *Debtor's Rights in Collateral as a Requirement for Attachment of a Security Interest Under the Uniform Commercial Code,* 26 S.D.L.Rev. 163, 164 (1981); see also, *CECO Corporation v. United States,* 554 F.Supp. 569, 572 (D.Minn.1982) (noting that, under Federal law, the standard against which an interest is measured is

whether it is perfected against any subsequent Judgment lien creditor).

Minnesota law is no different. In *Oldewurtel v. Redding*, 421 N.W.2d 722, 727 (Minn.1988), the Minnesota Supreme Court held that a party's security interest took priority over another party's subsequent Judgment lien. In expressing its opinion, the Court noted that, under Minnesota law, the basic rule of lien priority mandates, in disputes between creditors as to a lien on a debtor's property, that the first creditor to perfect the lien shall prevail. *Id.* at 725. The same principle applies here and, since D & K perfected its security interest prior to the creation of Cardinal's Judgment lien, D & K's interest is legally superior. *Id.* ("[T]he first lien in point of time takes precedence."), citing 11A *Dunnell Minnesota Digest 2d Liens*, 4.00 (1978).

As we have noted, Cardinal obtained a Judgment against Northland in June of 1999, and has since obtained a Writ of Execution of that Judgment against Northland. Cardinal has also served a Garnishment Summons upon Lakeside in order to recover any funds that Lakeside owed to Northland. Those actions have rendered Cardinal a Judgment lien creditor of Northland. Since Cardinal's status as a lien creditor did not arise until June of 1999, its interest in the pharmaceuticals found on Lakeside's premises is legally subordinated to D & K's perfected purchase money security interest, which arose, and was perfected, in 1998. If it were not for the alleged lawful transfer of the pharmaceuticals, from Northland to Lakeside, our inquiry would properly end here. However, the details surrounding the alleged transfer could, arguably, have a detrimental effect on the validity of the perfected security interest that is held by D & K.

Under Section 9–306 of the Uniform Commercial Code, a security interest continues in collateral, and the proceeds derived therefrom, after a transfer of the collateral. See, *Minnesota Statutes Section 336.9–306*. When a debtor makes an unauthorized disposition of collateral, the security interest continues in the collateral as it is found in the hands of the purchaser, or other transferee. *Id.; Minnesota Statutes Section 336.9–306, Official Comment 3*. Since the transferee takes subject to the security interest, the secured party may claim both the proceeds and the collateral, but it may have only one satisfaction. *Id.*

In asserting a claim to the proceeds obtained from the sale of the subject pharmaceuticals, Cardinal seeks the benefit of Section 9–307(1) of Uniform Commercial Code, which provides as follows:

> A buyer in the ordinary course of business *** takes free of a security interest created by the seller even though the security interest is perfected and even though the buyer knows of its existence.

*Minnesota Statutes Section 336.9–307(1).*

The Uniform Commercial Code defines a buyer in the ordinary course of business as follows:

> "Buyer in the ordinary course of business" means a person who in good faith and without knowledge that the sale to that person is in violation of the ownership rights or security interest of a third party in the goods buys in ordinary course from a person in the business of selling goods of that kind ***.

*Minnesota Statutes Section 336.1–201(9).*

According to Cardinal, if the transfer of the pharmaceuticals, from Northland to Lakeside, constituted a good faith sale in the ordinary course of business, then D & K's rights as a secured party would be terminated. In such an event, Lakeside, as the last holder of title to the pharmaceuticals, would be entitled to the proceeds from their subsequent sale and, as Lakeside's garnishor, and Northland's Judgment Creditor, Cardinal claims an entitlement to those proceeds.

In support of this entitlement, Cardinal claims that D & K has failed to produce any evidence that Lakeside was not a *bona fide*, good faith purchaser in the ordinary

course of business. In response, D & K contends that the sale, from Northland to Lakeside, was not a legitimate, arms-length transaction, for several reasons. First, Paragraph 5 of the Security Agreement, that extends between Northland and D & K, expressly prohibits Northland from making sales, transfers, or other dispositions of the goods, covered by that Agreement, except in the normal course of business, and except to the extent that D & K consents to the disposition, in advance, and in writing. See, *D & K's Verified Motion for Return of Property, Exhibit B.*

At the Hearing, witnesses for D & K testified, without contradiction, that the transfer between Northland and Lakeside was never authorized by D & K and, therefore, the transfer was not lawful. In addition, D & K's witnesses testified that only sales to nursing homes, and closed door care facilities, would qualify as "ordinary course of business transactions" by Northland. However, the sparsity of the Record on this point, fails to establish whether or not Lakeside was qualified, as a closed door care facility, to purchase the pharmaceuticals from Northland. Nor is there any evidence that the transfer, from Northland to Lakeside, was actually a sale—let alone a sale in good faith, and in the ordinary course of business. All that is known about Lakeside, on the Record before us, is that the pharmaceuticals at issue were seized by agents of the Federal Government from Lakeside's premises. Accordingly, there is no evidence that the transaction, which allowed the drugs to be found on Lakeside's premises, occurred in the ordinary course of business, and was effected in good faith.

■ Given the state of this Record, our analysis necessarily turns to the applicable burden of proof in proceedings such as these. Our research reflects that the Minnesota Courts have not previously considered whether a third party, who asserts that a transaction is "in the ordinary course of business" under U.C.C. Section 9–307, should properly bear the burden of proof. However, Courts in other jurisdictions have interpreted Section 9–307, and other analogous statutes, which employ the phrase "buyer in the ordinary course of business," and have held that the party who claims such a status should properly bear the burden of proof. See, *United States v. Continental Illinois National Bank and Trust Company of Chicago,* 889 F.2d 1248 (2nd Cir.1989) (holding that burden of proving "buyer in the ordinary course of business" status, under Section 9–307, is on the party asserting such status); see also, *In the Matter of Gary Aircraft Corp.,* 681 F.2d 365, 373, *cert. denied,* 462 U.S. 1131, 103 S.Ct. 3110, 77 L.Ed.2d 1366 (Tex.1983) (applying Texas law); *International Harvester Co. v. Glendenning,* 505 S.W.2d 320, 324 (Tex.Civ.App.1974); *In re Air Vermont, Inc.,* 44 B.R. 433, 437 (Bkrtcy.D.Vt.1984); *Transamerica Commercial Finance Corporation v. Union Bank & Trust Co.,* 584 So.2d 1299, 1305 (Ala.1991); *American National Bank v. Cloud,* 201 Cal.App.3d 766, 247 Cal.Rptr. 325 (1988); *Northern Commercial Company v. Cobb,* 778 P.2d 205, 208 (Alaska 1989); cf. *Holt Motor Co. v. R.C.A. Photophone,* 196 Minn. 527, 265 N.W. 313 (1936) (noting that, generally speaking, the burden of proof rests upon the party claiming the benefit of a statutory provision to show that he comes within its terms, and is entitled to its benefit); *Goette v. Howe,* 232 Minn. 168, 44 N.W.2d 734 (1950) (noting that purchaser of legal title, who wishes to avail himself of protection of rule in favor of *bona fide* purchaser, must bear the affirmative burden of proving the statutory elements of *bona fide* purchase); *Shraiberg v. Hanson,* 138 Minn. 80, 163 N.W. 1032 (1917) (holding that in action for specific performance of contract to sell realty, the burden of proving that the plaintiff was a *bona fide* purchaser within the Recording Act, and not affected by previous unrecorded instruments, was upon the plaintiff).

■ We agree with these general precepts, and hold that the burden of proving

an entitlement to a statutory benefit, rests with the party seeking that benefit. Here, Cardinal has failed to carry its burden of demonstrating its entitlement to the benefits of Minnesota Statutes Section 336.9–307. Cardinal has proffered no competent evidence that any form of sale occurred between Lakeside and Northland, much less that a transfer of the drugs occurred "in the ordinary course of business". Rather, Cardinal has sought to shift that burden of proof to D & K, but D & K does not seek the benefits of Section 336.9–307. D & K's burden, however, is only to establish its right to the drugs in question, or to the proceeds from the Court-authorized sale of those drugs. D & K has carried that burden.

■ The evidence supports D & K's assertion that it possessed a valid purchase money security interest in the pharmaceuticals which were sold to Northland, and which, subsequently, inexplicably made their way to Lakeside. Without contradiction in this Record, D & K entered a valid legal agreement with Northland, which prohibited the sale or other transfer of the pharmaceuticals, except with the consent of D & K. As to Lakeside, whatever the nature of the transfer may have been, the Record is uncontested that D & K did not consent to any such transfer. Additional testimony has cast considerable doubt on the capacity of Lakeside to legitimately purchase the pharmaceuticals from Northland, and neither Lakeside, nor Cardinal, has presented any evidence which would allow a reasonable inference that any transaction, between Northland and Lakeside, was undertaken in the ordinary course of business. Finally, D & K has adduced testimony, and a videotape, which support its contention that most, but not all, of the drugs found on Lakeside's premises, bore evidence that they originated at D & K, and not at Cardinal.

In sum, having no responsible basis to find, and conclude, that the drugs were transferred to Lakeside in the ordinary course of business, we are left to decide the priority of entitlement to the drugs, between the holder of a security interest which was perfected in 1998, and the holder of a Judgment lien, as to a Judgment that arose in 1999. As we have previously explained, the governing provisions of the U.C.C. make clear that the perfected security interest, as held by D & K, has legal priority over Cardinal's interest as a Judgment Creditor. Therefore, we find and conclude that the pharmaceuticals in question, and any proceeds from the Court-authorized sale of those pharmaceuticals, should be distributed to D & K.[4]

NOW, THEREFORE, It is—

RECOMMENDED:

That D & K's Motion for Return of Property [Docket No. 2] should be granted, and the pharmaceuticals in question, and any proceeds from their Court-authorized sale, should be distributed to D & K.

BY THE COURT.

### NOTICE

· Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D.Minn. LR1.1(f), and D.Minn. LR72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than October 25, 1999,** a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections. Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than October 25, 1999,** unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. § 636 to re-

---

**4.** The Record does not disclose the amount of proceeds at issue, but that is a factual matter that is not relevant to the Recommendation we make to the District Court.

view the transcript in order to resolve all of the objections made.