665 F.2d 36
 32 UCC Rep.Serv. 788
 In the Matter of EMERGENCY BEACON CORPORATION, Debtor.
MONTCO, INC., Plaintiff-Appellee,
v.
Stephen G. GLATZER, Defendant-Appellant.
Stephen G. GLATZER, Third-Party Plaintiff-Appellant,
v.
George HORVATH, Rocco Scappatura, Jack Polish, Langer and
Polish, Dana Jerry Horvath, Spencer Kellogg II, Cecil
Citron, Sherman and Citron, Elliot Lubarsky, Ralph Barber,
Roslyn Tabot, Montmartre Inc., Crafts Spun Yarn Inc., Mt.
Clemens Corp., Balder Enterprises, DJH Corporation,
Montmartco, Inc. et al., Third-Party Defendants-Appellees.
 Nos. 80-5063, 80-5065 and 80-5064.
 United States Court of Appeals,
Second Circuit.
 Argued June 8, 1981.
Decided Nov. 23, 1981.
 
 Stephen G. Glatzer, New Rochelle, N. Y., defendant-third-party plaintiff-appellant pro se.
 Sidney H. Reich, White Plains, N. Y., for plaintiff-appellee.
 Robert Kolodney, New York City, for third-party defendants-appellees Cecil Citron and Sherman & Citron.
 Brady & Tarpey, P.C., New York City (Daniel Gaven, New York City, on brief), for third-party defendants-appellees Rocco Scappatura, Jack Polish, Langer & Polish and Ralph Barber.
 Before OAKES and KEARSE, Circuit Judges, and RE, Chief Judge.*
 KEARSE, Circuit Judge:
 
 
 1
 The principal foci of this appeal are two Buick automobiles, one vintage 1973, the other 1974. Appellant Stephen G. Glatzer appeals from an order of the United States District Court for the Southern District of New York, Lee P. Gagliardi, Judge, which, inter alia, affirmed an order of the bankruptcy court directing Glatzer to surrender or pay the book value of the two automobiles, previously owned by the debtor, Emergency Beacon Corporation ("EBC"), to appellee Montco, Inc. Although we affirm so much of the district court's order as affirmed dismissal of a third party complaint,[1] we reverse and remand the order requiring Glatzer to surrender the cars or pay their book value.
 
 BACKGROUND
 
 2
 The controversy arises out of the financial difficulties of EBC, which was formed by Glatzer and Rocco Scappatura in 1968. Glatzer was EBC's president, Scappatura was vice-president, and after the firm went public each owned 28% of the issued and outstanding shares. Disputes arose, however, and by late 1974 there were discussions as to the possibility that either might buy the other's stock. Of greatest relevance here are the negotiations that took place at a meeting on November 3, 1974. In attendance were Glatzer, Scappatura, EBC's accountant Elliot Lubarsky, EBC's attorney Jack Polish, and an EBC director Spencer Kellogg II. At this meeting, as the bankruptcy court later found, Glatzer agreed to resign as an officer and director of EBC, EBC agreed to pay Glatzer $100,000 per year for two years, Glatzer agreed to serve as a consultant to EBC and agreed not to compete with EBC in the United States or Canada for three years, and Scappatura agreed to buy Glatzer's EBC shares for $200,000. EBC also agreed that Glatzer could keep any EBC equipment in his possession and that he was to pay EBC the book value of the company cars in his possession, i. e., the two Buicks.
 
 
 3
 Immediately after that meeting, Scappatura and Kellogg had second thoughts about the deal with Glatzer, although they held Glatzer to his resignation and refused to continue his salary. Despite renewed negotiations, EBC defaulted on its payments to Glatzer, who never received any part of the $200,000 he was to be paid by EBC, nor any payment from Scappatura.
 
 EBC's Claim and the 1977 Decision
 
 4
 On March 18, 1976, EBC filed a petition for an arrangement under Chapter XI of the Bankruptcy Act, 11 U.S.C. §§ 701-99 (1976), and continued to manage its business and property as a debtor-in-possession. It then commenced an adversary proceeding before the bankruptcy court for an order directing Glatzer to turn over certain property. Glatzer answered that his possession of the property was lawful and he counterclaimed for $200,000 for EBC's breach of the November 3, 1974 contract. In a decision rendered on December 28, 1977, the bankruptcy court, Howard Schwartzberg, Judge, ruled against EBC. The court found that at the November 3, 1974, meeting the parties had made the agreements described above and intended to be bound by those agreements. It found that the minutes of the meeting satisfied the formal requirements of New York's Statute of Frauds as set forth in either N.Y.U.C.C. § 2-201 (McKinney 1964), governing sales of goods, or N.Y.Gen.Oblig.Law § 5-701 (McKinney 1978), governing contracts not to be performed within one year. The court ruled, therefore, that EBC was obligated to pay Glatzer $200,000.
 
 
 5
 With regard to the two Buicks, the court found that "it was agreed that Glatzer was to keep whatever equipment in his possession that he wanted to keep and that he would pay for company cars at book value." The court ordered that the $200,000 owed by EBC to Glatzer "be reduced by the book value of the automobiles now in Glatzer's possession." The court's conclusions of law stated as follows:
 
 
 6
 4. The debtor, EBC, breached its agreement with Stephen Glatzer, whose proof of claim in the sum of $200,000 is sustained, less the book value as of March 18, 1976, of the debtor's automobiles now in his possession.
 
 
 7
 5. The parties agreed that Glatzer may retain these items of the debtor's equipment in his possession on November 3, 1974, and therefore, his retention of these items is not unlawful, nor may they be recovered, as prayed for in the debtor's complaint.
 
 
 8
 In accordance with his opinion, Judge Schwartzberg entered an order, also on December 28, 1977, dismissing EBC's complaint, stating that EBC had "failed to sustain its action against Stephen Glatzer for a turnover of the debtor's equipment in his possession as of November 3, 1974," and upholding Glatzer's counterclaim, providing in part as follows:
 
 
 9
 ORDERED, that Stephen Glatzer's proof of claim filed in this Chapter XI proceeding is hereby allowed in the sum of $200,000, less the book value, as of March 18, 1976, of the debtor's automobiles now in his possession.
 
 
 10
 This order was not appealed.
 
 Montco's Claim and the 1980 Decision
 
 11
 In March 1979, Harvey S. Barr, EBC's trustee in possession[2] sought permission from the bankruptcy court to give Glatzer a bill of sale and/or certificate of title for the two vehicles, free and clear of all liens. The trustee's application was opposed by Montco which, in 1975, had loaned EBC a total of $275,000, receiving a security interest in various EBC property that Montco contended included the two Buicks held by Glatzer. Montco had made appropriate U.C.C. filings with respect to these cars. Since in March 1979 more than $200,000 remained unpaid on its loan to EBC, Montco urged the denial of the trustee's application and requested the issuance of an order directing Glatzer either to deliver the cars to Montco or to pay Montco their book value. Montco's submission was treated as an adversary proceeding against Glatzer and Barr, and Glatzer filed an answer disputing Montco's security interest in the cars on the ground that title to the cars belonged to Glatzer.
 
 
 12
 On November 21, Judge Schwartzberg issued a decision denying the application of the trustee and granting that of Montco. Recalling that its December 28, 1977, order had found that EBC had agreed to sell the cars to Glatzer in November 1974, the court described its 1977 order as follows:
 
 
 13
 (T)he court upheld Glatzer's proof of claim filed in this Chapter XI proceeding, less the book value, as of March 18, 1976, of the debtor's automobiles in his possession.
 
 
 14
 The court's decision did not thereby confer upon Glatzer title to the automobiles. It recognized that he could acquire whatever interest or claim the debtor had in the vehicles by deducting for their book value from his claim. This would have legitimized Glatzer's possession vis a vis the debtor. Such acquisition of an interest in the vehicles by Glatzer was, of course, subject to any prior interest of others.
 
 
 15
 The court also stated, "There is nothing in writing before this court which would satisfy the Statute of Frauds to support Glatzer's title claim prior to this court's decision on December 28, 1977." Following a succession of additional hearings, the bankruptcy court ruled on January 17, 1980, that Montco had a valid security interest in the Buicks. The December and January rulings were eventually embodied in an order dated February 1, 1980, which directed Glatzer either to turn over the cars to Montco or to pay Montco their book value.
 
 
 16
 Glatzer appealed to the district court, which affirmed, and he now appeals the district court's decision under 11 U.S.C. § 47 (1976) and 28 U.S.C. § 1291 (1976). Since we conclude that Montco did not acquire a security interest in the two Buicks, we reverse this portion of the district court's order.
 
 DISCUSSION
 
 17
 The validity of the security interest claimed by Montco in the two Buicks depends on the effect of the November 3, 1974, agreement between Glatzer and EBC. Under the pertinent provision of the Uniform Commercial Code in effect in 1975, "(a) security interest cannot attach until there is agreement ... that it attach and value is given and the debtor has rights in the collateral." N.Y.U.C.C. § 9-204(1) (McKinney 1964) (citation omitted.)[3] Notwithstanding any agreement between the debtor and the creditor, if the debtor has no rights in the collateral, no security interest in that collateral comes into existence. See J. White & R. Summers, Uniform Commercial Code § 23-4, at 916 (2d ed. 1980). The question is, therefore, whether EBC had rights in the two Buicks in 1975 when it agreed to give Montco a security interest.
 
 
 18
 In determining what rights EBC had, we look to the bankruptcy court's 1977 decision in the adversary proceeding brought by EBC against Glatzer to regain possession of the Buicks.[4] In that 1977 decision the bankruptcy court found that on November 3, 1974, EBC and Glatzer had "agreed that Glatzer was to keep whatever equipment in his possession that he wanted to keep and that he would pay for company cars at book value," and the court therefore deducted from Glatzer's $200,000 breach of contract claim the book value of the two Buicks. This finding leads us to the legal conclusion that on November 3, 1974, the parties agreed on a sale of the Buicks to Glatzer. We disagree with the bankruptcy court's 1979 and 1980 rulings that the effect of its 1977 decision was, or perhaps should have been, simply that in 1974 Glatzer had obtained an option to buy the cars. While we are obliged to accept the bankruptcy court's undisturbed findings of fact unless they are clearly erroneous, see Queens Boulevard Wine & Liquor Corp. v. Blum, 503 F.2d 202 (2d Cir. 1974); Rules Bankr.Proc. Rule 810, we are not required to accept either its conclusions as to the legal effect of those findings, see Bank of Pennsylvania v. Adlman, 541 F.2d 999 (2d Cir. 1976), or its conclusions as to the legal effect of its prior decisions. Focusing on the bankruptcy court's purely factual finding that the parties agreed on November 3, 1974, that Glatzer could have the Buicks and would pay book value for them, we believe that New York law would characterize the transaction as a sale. See, e. g., Halsted v. Globe Indemnity Co., 258 N.Y. 176, 179 N.E. 376 (1932). We also note that this is the interpretation apparently given to the transaction by the bankruptcy court in 1977, since it is consistent with both the court's deduction, from Glatzer's $200,000 claim, of the book value of the cars, and with the court's conclusion that the parties had complied with N.Y.U.C.C. § 2-201, the statute of frauds section that applies to sales of goods.
 
 
 19
 Since EBC agreed in 1974 to sell the Buicks to Glatzer, the question whether EBC had any rights in the Buicks in 1975 turns on when title to the cars passed from EBC to Glatzer. In general the U.C.C. is designed to provide that the passage of title occurs at "the time when the seller has finally committed himself in regard to specific goods." See Official Comment No. 4 to U.C.C. § 2-401. In the common situation in which delivery of the goods occurs after the agreement is made, title passes at the time of delivery. N.Y.U.C.C. § 2-401(2) (McKinney 1964).[5] In the present case, however, since Glatzer had possession of the Buicks prior to the time the sale was agreed to, we look to N.Y.U.C.C. § 2-401(3), which provides as follows:
 
 
 20
 Unless otherwise explicitly agreed where delivery is to be made without moving the goods,
 
 
 21
 (a) if the seller is to deliver a document of title, title passes at the time when and the place where he delivers such documents; or
 
 
 22
 (b) if the goods are at the time of contracting already identified and no documents are to be delivered, title passes at the time and place of contracting.
 
 
 23
 Because of Glatzer's possession of the cars, there was to be no delivery by movement of the cars. Further, since there is no suggestion that the parties intended that EBC would deliver a document of title with respect to the cars, and since the cars were already identified, subsection (b) is the pertinent portion of § 2-401(3). Under subsection (b), title to the cars passed to Glatzer at the time the contract was entered into, i. e., November 3, 1974.
 
 
 24
 Montco contends that subsection (a) is the more pertinent portion of § 2-401(3), arguing that § 2113 of the New York Vehicle and Traffic Law requires the transfer of a certificate of title in order for a sale to be effective. Section 2113 provides, in part, as follows:
 
 
 25
 (a) If an owner transfers his interest in a vehicle, other than by the creation of a security interest, he shall, at the time of the delivery of the vehicle, execute an assignment and warranty of title to the transferee in the space provided therefor on the certificate or as the commissioner prescribes, and cause the certificate and assignment to be mailed or delivered to the transferee....
 
 
 26
 (c) Except as provided in section two thousand one hundred fourteen, a transfer by an owner is not perfected so as to be valid against third parties generally until the provisions of this section ... have been complied with....
 
 
 27
 We reject Montco's argument because the Vehicle and Traffic Law does not answer the question of when ownership in an automobile passes, and a vehicle certificate of title is not a "document of title" as the latter term is used by the U.C.C.
 
 
 28
 The U.C.C. defines documents of title to include "any ... document which in the regular course of business or financing is treated as adequately evidencing that the person in possession of it is entitled to receive, hold and dispose of the document and the goods it covers." N.Y.U.C.C. § 1-201(15) (McKinney 1964). Section 2108(c) of the Vehicle and Traffic Law provides that a certificate of title "is prima facie evidence of the facts appearing on it." The implication of the provision that the certificate is "prima facie" evidence is, of course, that statements in the certificate are subject to rebuttal. Thus it does not appear that a vehicle certificate of title carries with it the certitude envisioned by the U.C.C.'s term "document of title" since it cannot be treated as "adequately evidencing" ownership of the vehicle.
 
 
 29
 Although the courts of New York apparently have not yet addressed this question, we note that the New York provisions are taken from the Uniform Motor Vehicle Certificate of Title and Anti-Theft Act §§ 1-57 (1955), and that the courts of other states having similar laws have ruled, when confronted with circumstances similar to those of the present case, that the U.C.C.'s phrase "documents of title" does not refer to vehicle certificates of title. In National Exchange Bank v. Mann, 81 Wis.2d 352, 260 N.W.2d 716 (1978), for example, a buyer purchased a car from a seller and took possession but did not receive a certificate of title; the seller then used the certificate to obtain a loan. The Wisconsin Supreme Court was required to construe the Wisconsin vehicle law whose pertinent provisions were virtually identical to those of New York,[6] in determining whether a certificate of title was a "document of title" within the meaning of the Wisconsin counterpart of N.Y.U.C.C. § 2-401(2), see note 5, supra, and accompanying text. The Wisconsin court rejected the lender's attempt to foreclose on the car, holding that under the U.C.C. title had passed to the buyer at the time of the sale, notwithstanding nondelivery of the certificate of title. Observing that the Wisconsin vehicle statute provided that the certificate is only prima facie evidence of its contents, id. 260 N.W.2d at 720, the court stated as follows:
 
 
 30
 Automobile certificates of title have not generally been accorded the legal status of documents of title as that term is used in the Uniform Commercial Code because vehicle certification statutes based upon the Uniform Act do not recognize a pledge of the certificate as effective to perfect an interest. 1 G. Gilmore, Security Interests in Personal Property, § 20.5 at 566 (1965); sec. 401.201(15), Stats. The Wisconsin vehicle certification statutes conform to this doctrine. See, secs. 342-19-20, Stats. Therefore, unless otherwise agreed or otherwise required by law, title to the property which is the subject of a sale within the scope of the Commercial Code passes to the buyer at the time physical possession is transferred.
 
 
 31
 Id. 260 N.W.2d at 719. See also Wood Chevrolet Co. v. Bank of the Southeast, 352 So.2d 1350 (Ala.1977), in which the court stated as follows:
 
 
 32
 It has been held that non-delivery of a certificate of title at the time of a sale does not prevent the passage of title from the seller to the buyer.... This is true even where a state's certificate of title act provides that no title can be acquired in an automobile until the certificate of title has been issued.
 
 
 33
 Id. at 1352-53 (citations omitted).
 
 
 34
 We are aware of no authority ruling that a security interest could attach, to a vehicle that the debtor had already sold, simply because the certificate of title had not been transferred. In the circumstances, we infer that New York would interpret N.Y.U.C.C. § 2-401(3) as referring to documents other than vehicle certificates of title.
 
 
 35
 Accordingly, we conclude that under N.Y.U.C.C. § 2-401(3)(b) title to the two Buicks passed from EBC to Glatzer in November 1974. With this passage of title, EBC had no further rights in the Buicks, and hence it could not convey a security interest in those cars to Montco in 1975.
 
 CONCLUSION
 
 36
 The order of the district court is affirmed insofar as it affirmed the bankruptcy court's dismissal of Glatzer's third-party complaint. Insofar as it affirmed the order requiring Glatzer to deliver or pay book value of the cars, we reverse and remand so that an appropriate order may be entered allowing the trustee to deliver bills of sale and/or certificates of title to Glatzer.
 
 
 
 *
 Honorable Edward D. Re, Chief Judge of the United States Court of International Trade, sitting by designation
 
 
 [1]
 In the bankruptcy court Glatzer had filed a third-party complaint alleging that his loss of the Buicks was the result of a fraudulent scheme by the third-party defendants. The bankruptcy court dismissed for lack of jurisdiction, and we affirm the district court's order insofar as it affirmed this dismissal. Because the subject matter of Glatzer's third-party complaint was neither EBC nor property belonging to it, the bankruptcy court had no jurisdiction. Gordon v. Shirley Duke Associates, 611 F.2d 15, 18 (1979). See 11 U.S.C. § 711 (1976). Glatzer remains free to bring this action in a court of competent jurisdiction
 
 
 [2]
 EBC comes to have a trustee in possession through a circuitous route. Following the November 3, 1974, agreement, Scappatura took over the management of the company. On February 18, 1976, EBC filed a petition for an arrangement under Chapter XI of the Bankruptcy Act. The Scappatura-led debtor continued in business as a debtor in possession until March 11, 1977, when it consented to an adjudication in bankruptcy, and an order to that effect was entered on that day. Barr was appointed trustee in bankruptcy. Thereafter, in April 1977, Glatzer was elected president of EBC at a shareholders meeting and the new management filed a second Chapter XI petition which was accepted by the bankruptcy court, leading Judge Schwartzberg to describe the process as a "phoenix-like emergence of a corporation in a second Chapter XI proceeding." Under § 342 of the Bankruptcy Act and Rules of Bankruptcy Procedure 11-18(b), the court retained Barr as trustee in possession
 
 
 [3]
 In 1977, amendments to the Uniform Commercial Code in New York consolidated certain requirements. The requirement of former § 9-204(1) that a debtor must have rights in the collateral in order to grant a security interest became part of § 9-203(1). See N.Y.U.C.C. § 9-203(1) (McKinney Supp.1980)
 
 
 [4]
 We reject Montco's contention that the bankruptcy court's 1977 decision is not binding on Montco because it was not a party to the adversary proceeding. The decision in that proceeding determined EBC's rights in the two Buicks, and thereby delimited the ability of EBC to transfer rights in that property to others. See Restatement (Second) of Judgments § 89 (Tent.Draft No. 3, 1976); id. comments b and f
 
 
 [5]
 Section 2-401(2) provides in relevant part as follows:
 Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods ... even though a document of title is to be delivered at a different time or place.
 
 
 [6]
 The Wisconsin counterpart of New York's § 2113 provided, in pertinent part, as follows:
 "(1) If an owner transfers his interest in a vehicle, other than by the creation of a security interest, he shall at the time of the delivery of the vehicle, execute an assignment and warranty of title to the transferee in the space provided therefor on the certificate, and cause the certificate to be mailed or delivered to the transferee....
 "(3) Except as provided in s.342.16 and as between the parties, a transfer by an owner is not effective until the provisions of this section have been complied with."
 National Exchange Bank v. Mann, supra, 260 N.W.2d at 717-718.
 The Wisconsin counterpart of New York's § 2108(c) provided as follows:
 "A certificate of title issued by the division is prima facie evidence of the facts appearing on it."
 Id. 260 N.W.2d at 719.