**The HONG KONG AND SHANGHAI BANKING CORP., LTD.,**
Plaintiff,

v.

**HFH USA CORPORATION, Defendant.**

**No. 90–CV–315S.**

United States District Court,
W.D. New York.

Sept. 30, 1992.

David J. McNamara, Phillips, Lytle, Hitchcock, Blaine & Huber, Buffalo, N.Y., for plaintiff.

Dickson Phillips, III, Robinson, Bradshaw & Hinson, Charlotte, N.C., Carol E. Heckman, Lippes, Kaminsky, Silverstein, Porter, Mathias & Wexler, Buffalo, N.Y., for defendant.

## DECISION AND ORDER

SKRETNY, District Judge.

Before this Court is the motion of the plaintiff Hong Kong and Shanghai Banking Corp., Ltd. ("HSBC") for summary judgment pursuant to Fed.R.Civ.P. 56. HSBC has filed a complaint seeking damages, alleging that the defendant HFH USA Corp. ("HFH") converted property in which HSBC had a perfected first lien security interest.

This Court has jurisdiction based on diversity of citizenship under 28 U.S.C. § 1332. HSBC is a foreign banking corporation with its principal place of business in Hong Kong. HFH is a corporation organized and existing under the laws of North Carolina. The matter in controversy exceeds $50,000.

HSBC alleges that it loaned funds to Eli Industries (USA), Inc. ("Eli"), secured by a perfected first lien security interest in Eli's present and future inventory. Hugo Finkenrath OHG ("Finkenrath") sold goods to Eli that were included as inventory under HSBC's security agreement with Eli. Plaintiff never received notice of any security interest in these goods claimed by Finkenrath or HFH. On behalf of Finkenrath, HFH took possession of the goods and returned them to Finkenrath in Germany. HSBC notified HFH of its prior perfected security interest in the inventory and demanded either return of the goods or payment of their value to HSBC. The inventory was never returned to HSBC, nor was any payment made. Therefore, HSBC claims that HFH converted these goods, in which HSBC had a superior interest.

As defenses, HFH asserts that it was acting as an agent for Finkenrath. HFH alleges that Finkenrath had rights in the goods that were superior to those of HSBC, under a title retention agreement between Finkenrath and Eli that was included in the sales contract and that is governed by German law. In the alternative, HFH maintains that if New York's U.C.C. applies, Finkenrath repurchased the goods from Eli as a buyer in the ordinary course of business, and therefore took them free of any prior existing security agreements. Also in the alternative, HFH claims that even if the U.C.C. applies, HSBC's security interest did not attach to the goods, and that at all times Finkenrath had rights in the goods that were superior to those of HSBC.

HSBC has submitted the following papers in support of its motion for summary judgment: a Notice of Motion for Summary Judgment ("Plaintiff's Motion") with exhibits, including an Affidavit of John LeClair ("LeClair Sept. 7 Aff.") sworn to 9/7/90, a Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment ("Plaintiff's Memo"), a Reply Memorandum ("Plaintiff's Reply"), an Affidavit of John LeClair with exhibits ("LeClair Nov. 13 Aff.") sworn to 11/13/90, a Supplemental Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment ("Plaintiff's Supp.Memo"), and an Affidavit of John LeClair with exhibits ("LeClair Mar. 29 Aff.") sworn to 3/29/91.

Defendant has submitted the following papers in opposition to the motion. Defendant HFH's Brief in Opposition to Plaintiff's Motion for Summary Judgment ("De-

fendant's Brief"), an Affidavit of J. Dickson Phillips, III ("Dickson Aff.") dated 10/31/90, Defendant's Response to Plaintiff's Statement of Undisputed Facts ("Defendant's Response to Plaintiff's Facts"), an Affidavit of Manfred Pollmann with exhibits ("Pollmann Aff.") sworn to 10/16/90, Defendant HFH USA Corporation's Response to Plaintiff's Reply ("Defendant's Response to Reply"), and Defendant HFH USA Corporation's Supplemental Memorandum in Opposition to Plaintiff's Motion for Summary Judgment with exhibits ("Defendant's Supp.Memo").

This Court has also heard and considered oral argument of the parties.

For the reasons stated below, this Court grants summary judgment for HSBC with regard to HFH's liability for conversion, and denies summary judgment with regard to damages.

## FACTS

In early 1987, Mr. Siegfried Finkenrath, principal shareholder of Finkenrath, was approached by representatives of Eli GmbH, Bendestorf ("Eli Germany"), the parent company of Eli, to discuss the purchase of goods on behalf of Eli (Pollmann Aff., ¶ 2).

On April 6 and 7, 1987, Werner Schlautmann and Paul Chandra, president and vice president of Eli, attended the Hannover trade show in the Federal Republic of Germany. There, they entered into an oral agreement with Manfred Pollmann, export manager of Finkenrath, wherein Finkenrath agreed to sell goods consisting of "split pillow block housings" and "maintenance free housings" to Eli, for the price of $342,744.60 (Pollmann Aff., ¶ 3).

As a condition of the sale, Eli and Finkenrath agreed that German law would govern the parties' rights and obligations (Pollmann Aff., ¶ 3).

Following the oral sales agreement, Finkenrath shipped the "split pillow block housings" on July 25, 1987 ("first shipment") to the foreign trade zone ("FTZ") in Buffalo, New York. The exact date of arrival of these goods has not been specified. Under the sales agreement, Eli was to pay the customs duty on the goods. However, Eli never made the required payment; thus goods in the first shipment remained in the warehouse of the FTZ (Pollmann Aff., ¶ 6).

In November 1987, Eli sought a line of credit from HSBC. On November 30, 1987, Eli signed a security agreement with HSBC, in which it granted the bank a security interest in, among other things:

> ... all of the personal property and fixtures of the Debtor wherever located and whether now owned or in existence or hereafter acquired or arising, of every kind and description, tangible or intangible, including, without limitation, all inventory, equipment, farm products, documents, instruments, chattel paper, accounts, contract rights and general intangibles, such terms having the meanings ascribed by the Uniform Commercial Code.

This agreement was signed by Werner Schlautmann, president of Eli, and stated that "New York law shall govern this agreement and its construction." A U.C.C.-1 financing statement was filed with the Erie County Clerk on December 21, 1987 (Plaintiff's Supp.Memo, p. 3). On December 5, 1987 HFH, as agent of Finkenrath, sent the second shipment of goods consisting of "maintenance free housings" to Eli ("second shipment"). The goods were again shipped to the FTZ, but this time HFH pre-paid the customs duty, and the goods were delivered to Eli at its place of business in Buffalo, New York (Pollmann Aff., ¶¶ 7 and 8). The exact date of arrival of these goods has not been specified. Finkenrath billed Eli $160,970.88 for the second shipment (Pollmann Aff., ¶ 7).

On February 3, 1988, Eli executed a second security agreement for an additional line of credit with HSBC. This agreement was identical to the first agreement. There is no indication that the second security agreement was accompanied by the filing of a second U.C.C.-1 financing statement.

On February 8, 1988, HSBC issued an irrevocable letter of credit in favor of Eli in

the amount of $122,088.05 ("first letter of credit"). The application for this letter of credit, dated January 29, 1988, specifies that the goods to be purchased are known as "American standard sprockets." (LeClair Nov. 13, Aff., exh. A).

A third shipment of goods, consisting of "maintenance free housings" ("third shipment"), were sent by HFH, as agent of Finkenrath, to Eli on February 10, 1988, under the same terms and conditions as the second shipment. That is, HFH pre-paid the customs duty and delivery was to Eli's place of business (Pollmann Aff., ¶ 11). The exact date of arrival of these goods has not been specified, but the parties do not dispute that goods in the second and third shipments were received by Eli. Finkenrath billed Eli $78,803.52 for the third shipment (Pollmann Aff., ¶ 9).

Shortly after the third shipment left Germany, Finkenrath and HFH learned of Eli's financial problems and of its inability to pay the Bill of Exchange for the first shipment. To avoid having the Bill of Exchange dishonored, Finkenrath paid the Bill of Exchange and sent new drafts to Eli (Pollmann Aff., ¶ 11).

On or about March 21, 1988, payment of $122,008.05 was made by HSBC to Aantek Aandrijvingen Bv, P.O. Box 163, 7240 Ad Lochem, Holland, as beneficiary of the first letter of credit (LeClair Mar. 29 Aff., exh. C).

After the third shipment was sent, Finkenrath and HFH became aware of HSBC's security interest in Eli's inventory. Each claimed to have obtained a purchase money security agreement in the goods that had been shipped. Finkenrath and HFH entered into security agreements with Eli and filed financing statements on April 18, 1988 with the Erie County Clerk's Office (Pollmann Aff., exh. C). Neither Finkenrath nor HFH notified HSBC of their security interests or filings.

HSBC issued the second letter of credit to Eli on May 5, 1988 in the amount of $169,251.84. Payments pursuant to this letter of credit were made in two drafts, one on July 11, 1988 in the amount of $120,309.51, and the other on August 1, 1988 in the amount of $17,731.11[1], to Forged and Machined Products Ltd., Suite 1616, Asian House, 1 Hennessy Road, Hong Kong, the beneficiary of the second letter of credit (LeClair Mar. 29 Aff., exh. C).

In June 1988, Finkenrath and Eli reached an oral agreement that Eli would return the unsold portion of the goods from the second and third shipments to Finkenrath via HFH in Charlotte, North Carolina, and that Finkenrath would reclaim the First Shipment from the FTZ (Pollmann Aff., ¶ 13).

On August 26, 1988, Eli shipped the goods that remained in its possession to HFH in Charlotte, N.C. for return to Finkenrath. On August 30, 1988, Finkenrath paid the storage charges in the FTZ, arranged shipment to Germany, and thereby reclaimed the goods in the first shipment. Also on August 30, 1988, representatives of Eli and HFH, acting as Finkenrath's agent, executed a written agreement that purported to memorialize the original oral agreement ("return agreement") made between Finkenrath and Eli in June 1988 (Pollmann Aff., ¶ 16).

Under the return agreement, Finkenrath would retain title to the goods until it was paid in full. Eli would transfer all its remaining goods from the second and third shipments to HFH for return to Finkenrath. The parties' security interests in the goods were to end upon the return of the goods to Finkenrath. However, if any subsequent judicial decree required HFH to return the goods to Eli, the cancellation of the security interests would become null and void (Pollmann Aff., exh. E). The parties do not dispute that the goods in question consisted of inventory to Eli and were therefore contemplated by HSBC's security agreements.

1. There appears to be a typographical error regarding the date in Plaintiff's Answers to Defendant's Second Set of Interrogatories, wherein it states that "HSBC accepted the beneficiary's first sight draft on the second letter of credit on July 11, *1985.*"

Eli began to liquidate its assets in 1988. Defendant claims that this liquidation was undertaken by HSBC (Defendant's Supp. Memo, p. 11), but HSBC denies this. (LeClair Mar. 29 Aff., ¶ 6; Plaintiff's Supp. Memo, p. 14). HSBC received approximately $80,000 as proceeds from the sales of Eli's assets. At least some portion of these funds were applied to Eli's debt for outstanding interest on the principal balance from the letters of credit (LeClair Mar. 29 Aff., exh. C).

## DISCUSSION

Federal Rule of Civil Procedure 56(c) provides in pertinent part that summary judgment is warranted where "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Under the Rule, the moving party has the burden of showing that a genuine issue as to any material fact is absent. *Adickes v. S.H. Kress and Co.*, 398 U.S. 144, 156, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). However, the evidence and the inferences drawn from the evidence must be "viewed in the light most favorable to the party opposing the motion." 398 U.S. at 158–59, 90 S.Ct. at 1609.

When a movant makes a showing of the essential elements of its case, sufficient to demonstrate that a factfinder could find in its favor, then its opponent must counter with evidence sufficient to demonstrate that "a reasonable jury could return a verdict" in its favor to defeat the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986), *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). However, a summary judgment motion will not be defeated merely on the basis of a "metaphysical doubt" about the facts, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986), "or on the basis of conjecture or surmise." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.1991).

This Court has specifically noted that "courts should not be reluctant to grant summary judgment in appropriate cases since '[o]ne of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims.'" *Maier–Schule GMC, Inc. v. General Motors Corp.*, 780 F.Supp. 984, 987 (W.D.N.Y. 1991), quoting *Celotex Corp. v. Catrett*, 477 U.S. at 323–24, 106 S.Ct. at 2553.

Under the criteria articulated above, a district court "judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2511.

The material facts of this controversy are not in dispute. The principal issues that remain are: (1) whether Eli acquired an interest in any of the goods sufficient for HSBC's security interest to attach; and (2) whether New York's U.C.C. governs the existing security interests or whether German law controls, validating the title retention agreement. If the U.C.C. controls, the next issue becomes whether HSBC or Finkenrath/HFH had priority of interest.

HSBC argues that the written security agreement between HSBC and Eli was sufficient to create a security interest in all the goods shipped by Finkenrath to Eli, according to U.C.C. § 9–203. HSBC argues that the agreement was properly executed, that HSBC gave value to Eli when it issued the two letters of credit, and that Eli obtained rights in all three shipments of goods upon delivery to the destination provided in the sales agreement. With respect to the first shipment, HSBC argues that mere delivery to the FTZ as per the sales agreement was sufficient to give Eli rights in those goods (Plaintiff's Supp.Memo, p. 6).

HSBC further argues that security interests in the goods purchased by Eli should be governed by the U.C.C., despite the reference to German law in the title retention agreement between Finkenrath and Eli. HSBC claims that under U.C.C. § 2–401(1) such an agreement creates only a security interest that must be properly perfected (Plaintiff's Memo, p. 5).

HSBC also claims that neither HFH nor Finkenrath properly perfected a purchase

money security interest in the goods shipped to Eli. Therefore, HSBC's security interest had priority. In support of this claim, HSBC points to defendant's failure to comply with the notice requirement of U.C.C. §§ 9–312(3)(b) and 9–114(1)(b) (Plaintiff's Memo, p. 6).

HSBC claims there are no disputed issues of fact precluding summary judgment. It claims that HFH has no standing to request additional discovery regarding the commercial reasonableness of the liquidation of Eli's collateral. HSBC asserts that Eli's debt to HSBC under the first letter of credit is valid, and that any non-conformities in the documentation were waived by Eli. Further, Eli acknowledged the debt by liquidating its assets to pay the interest and expenses due under the letters of credit. HSBC contends that, in spite of the liquidation, none of Eli's payments have been applied to the principal amounts due under the letters of credit (Plaintiff's Supp. Memo, p. 18).

HFH responds that the motion is premature. HFH argues that it needs additional discovery regarding the validity of Eli's debt to HSBC. HFH suggests that there may be a question regarding the commercial reasonableness of the liquidation of Eli's assets, according to U.C.C. § 9–507, and of HSBC's good faith in its dealings with Eli during the liquidation.

HFH argues that the parties' rights in the goods are governed by German law and that, under such law, the title retention agreement between Eli and Finkenrath gave Finkenrath rights in the goods that are superior to those of HSBC. HFH relies on U.C.C. § 1–105 for the proposition that the parties are generally free to agree on the law that will apply to their sales contract. HFH contends that the parties elected to have German law control and that, under German law, Finkenrath retained title to the goods until it received payment in full.

With respect to the first shipment alone, HFH argues that because the goods remained in the FTZ, Eli did not obtain sufficient rights in the goods to permit HSBC's security interest to attach. In the alterna-

tive, HFH argues that even if HSBC's security interest did attach, Finkenrath's security interest in those goods was automatically perfected, did not require a filing and remained perfected because Eli never took lawful possession, according to U.C.C. § 9–113 (Defendant's Brief, p. 8; Defendant's Supp.Memo, p. 17). HFH further argues that under New York State law, goods delivered to an FTZ are not subject to New York law until the customs duty is paid and they are imported into the state (Defendant's Supp.Memo, pp. 18–19).

Finally, HFH argues that summary judgment is inappropriate because issues of liability are too intimately connected to issues of damages (Defendant's Supp.Memo, pp. 19–20).

Both parties in this case claim to have perfected security interests in the goods that Eli purchased from Finkenrath. The shipments differ in that the first shipment never left the FTZ, while the second and third shipments were delivered directly to Eli's place of business. Therefore, these shipments will be discussed separately.

## GOODS IN THE FIRST SHIPMENT

■ To prevail on a conversion claim, the plaintiff must show that he had superior rights in the property at the time of the alleged conversion by another. *Kaufman v. Simons Motor Sales Co.*, 261 N.Y. 146, 184 N.E. 739 (1933). Therefore, to determine whether HFH converted goods in which HSBC had a superior interest, it is first necessary to identify the nature of the interests involved. To do this, however, this Court must first determine what law should be applied to identify the nature of the interests.

■ Under normal circumstances, contracting parties are free to stipulate what state's or nation's law will govern their contractual rights and duties, provided that the state or nation has a reasonable relationship with the transaction, and the law chosen does not violate a fundamental public policy of the forum state. *Siegelman v. Cunard White Star, Ltd.*, 221 F.2d 189 (2d Cir.1955); *Culbert v. Rols Capital Co.*, 184

A.D.2d 612, 585 N.Y.S.2d 67 (2d Dep't 1992). Nonetheless, the parties' stipulation will not be regarded where it would operate to the detriment of strangers to the agreement, such as creditors or lienholders. *Broadcasting Rights International Corp. v. Societe du Tour de France*, 675 F.Supp. 1439, 1448 (S.D.N.Y.1987); *Carlson v. Tandy Computer Leasing*, 803 F.2d 391 (8th Cir.1986). Where the rights of third parties are implicated, the court should be governed by the ordinary rule that the federal district courts apply the choice of law rules of the state in which they sit. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). The district court must apply the law it believes the state's highest court would apply.

■ In this case, the agreement between Finkenrath and Eli provided that German law was to govern the interests and relationships created under the agreement. Under German law, the title retention provision in the agreement would be operative, and Finkenrath would have title to the goods, instead of a mere security interest. If this dispute involved only Eli and Finkenrath (or its agent HFH), this Court would respect the parties' stipulation of German law in the agreement. Nevertheless, because the stipulation would work to the detriment of HSBC—a third party and a stranger to the agreement—this Court must disregard the stipulation and look to the forum state's choice of law rules to determine the interests of the parties.

The New York courts recognize that parties to a contract may agree that their contract will be governed by the laws of a chosen jurisdiction. Section 1–105 of New York's U.C.C. embodies this principle, subject to certain statutory exceptions. Section 1–105 provides:

(2) Where one of the following provisions of this Act specifies the applicable law, that provision governs and a contrary agreement is effective only to the extent permitted by the law (including the conflict of laws rules) so specified:

... Policy and scope of the Articles on Secured Transactions.

Sections 9–102 and 9–103.

Thus when the dispute falls within the scope of § 9–102, the parties' freedom to stipulate the applicable law is limited. This point is reinforced by the Official Commentary to § 1–105, which states:

5. Subsection (2) spells out essential limitations on the parties' right to choose the applicable law. Especially in Article 9 parties taking a security interest or asked to extend credit which may be subject to a security interest must have sure ways to find out whether and where to file and where to look for possible existing filings.[2]

The present dispute does indeed fall within the scope of Article 9 of the U.C.C. Section 9–102 describes the scope of Article 9 as follows:

(1) ... this Article applies

(a) to any transaction (regardless of its form) which is intended to create a security interest in personal property or fixtures including goods ...

(2) This Article applies to security interests created by ... title retention contract....

Therefore, regardless of the parties' stipulation of German law, this Court must look to Article 9 of the U.C.C. to identify and prioritize the interests held by HSBC and HFH.[3]

---

**2.** *See also Carlson v. Tandy Computer Leasing*, 803 F.2d 391, 394 (8th Cir.1986) ("The policy behind section 1–105(2) ... is to prohibit choice of law agreements when the rights of third parties are at stake.").

**3.** New York law is also applicable to the present facts under "interest analysis," the New York approach to choice of law problems. *See Intercontinental Planning, Ltd. v. Daystrom, Inc.*, 24 N.Y.2d 372, 300 N.Y.S.2d 817, 248 N.E.2d 576 (1969), and *Conlon v. Wanamaker*, 583 F.Supp.

212 (E.D.N.Y.1984). Under the principles of interest analysis, New York law would apply due to the importance of the contacts that the transactions had with the state. For instance, the goods were located in New York, with the exception of the first shipment, which was intended ultimately to reach New York. Further, all of the relevant U.C.C.–1 financing statements were filed in New York State. Finally, the application of New York law would further the goals of Article 9 of New York's U.C.C.: predict-

In this case, HFH fails to recognize that § 9–102, as well as § 9–103, is an exception under § 1–105(2). Section 1–105(2) brings security interests formed through title retention contracts within the scope of Article 9. This operation of the statute has been noted in *Carlson v. Tandy Computer Leasing*, 803 F.2d 391 (8th Cir.1986), which applied § 9–102 under circumstances similar to those in the present case. In *Carlson*, the parties executed a "lease" of computer equipment, and provided that their agreement was to be governed by Texas law, although the equipment was at all relevant times in Missouri. Under Missouri's U.C.C. § 9–102, certain lease agreements are construed as security interests. The court looked to U.C.C. § 1–105, and determined that the parties were not entitled to choose the applicable law where their dispute fell within the scope of § 9–102. The court determined that the dispute fell within § 9–102, and looked to § 1–201(37) to determine the effect of the lease agreement. This Court believes such an analysis to be logically sound, and applicable to the present facts. Consequently, when this Court looks to New York's U.C.C. § 1–201(37), it determines that the "retention or reservation of title by a seller of goods notwithstanding shipment or delivery to the buyer (Section 2–401) is limited in effect to a reservation of a 'security interest.'"

If German law were applied under the present circumstances, it would violate a fundamental purpose of New York's U.C.C. Article 9: "to create commercial certainty and predictability by allowing third party creditors to rely on the specific perfection and priority rules that govern collateral within the scope of Article 9." *Id.* at 394.

■ Finally, HFH's argument that New York's U.C.C. cannot be applied to goods stored in an FTZ is unavailing. HFH cites *During v. Valente*, 267 A.D. 383, 46 N.Y.S.2d 385 (1st Dep't 1944), holding that New York's Alcoholic Beverage Control Law cannot be applied to goods in an FTZ because the goods are still in international commerce. This Court will not extend the ability of transactions and the provision of no-

principle of *During* to the present facts. Here, there is no state agency or department seeking to regulate or tax goods in an FTZ. Rather, this Court is looking to the U.C.C. merely to determine the parties' interests in goods that have been delivered to the FTZ with the intention that they be imported into New York State.

Having concluded that the New York U.C.C. will be applied, it is now necessary to determine whether Eli possessed sufficient rights in the goods contained in the first shipment for HSBC's security interest to attach.

## ELI'S RIGHTS IN THE COLLATERAL

Under U.C.C. § 9–203(1), a security interest attaches when:

(a) the collateral is in the possession of the secured party pursuant to agreement, or the debtor has signed a security agreement which contains a description of the collateral . . .; and

(b) value has been given; and

(c) the debtor has rights in the collateral.

In the present case, HFH argues that HSBC did not acquire a security interest in the goods contained in the first shipment because Eli never acquired rights in the goods. HFH maintains that because Eli never paid the customs duty on the goods or took physical possession of them, no rights were acquired. This argument of HFH is unpersuasive. This Court finds that Eli did possess sufficient rights in the goods for HSBC to acquire a security interest in them pursuant to its security agreement.

■ Although the U.C.C. does not define the term "rights in the collateral", other courts have found assistance in U.C.C. § 2–401, which deals with the passage of title to goods. Section 2–401 provides:

(1) . . . Any retention or reservation by the seller of the title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest. . . .

(2) Unless otherwise explicitly agreed title passes to the buyer at the time and

tice to prospective creditors.

place at which the seller completes his performance with reference to the physical delivery of the goods, despite any reservation of a security interest and even though a document of title is to be delivered at a different time or place; and in particular and despite any reservation of a security interest in the bill of lading.

Two things in this section are worthy of note. First, title retention contracts are construed as creating only security interests under the U.C.C. As indicated above, § 9–102 brings such interests within the scope of Article 9, according to New York's choice of law rules embodied in U.C.C. § 1–105. *See Carlson v. Tandy Computer Leasing*, 803 F.2d 391 (8th Cir.1986) (construing parallel provisions of Missouri's U.C.C.). Second, title to goods passes when the seller fulfills his obligation to deliver the goods to the place identified in the contract. Although title is not the precise equivalent of "rights in the collateral," title is indicative of certain rights that the debtor has to dispose of the goods. Hence, in *MEI International, Inc. v. Schenkers International Forwarders, Inc.*, 807 F.Supp. 979 (S.D.N.Y.1992), the court wrote,

"Under U.C.C. § 2–401(2), title to goods passes at the time and place that the seller completes performance with respect to the physical delivery of the goods. The contract between [the parties] required ... delivery of the goods in a foreign trade zone or in Panama. Consequently, had the contract been performed as contemplated ... [the buyer] would have received title when the goods were delivered to the foreign trade zone and attained zone-restricted status."

▮ There is nothing in the agreement between Finkenrath and Eli indicating that title did not pass upon delivery to the FTZ. Although the agreement assumes the application of German law, this Court is bound to construe the title retention clause as a security interest under New York's U.C.C. Under this construction, title to the goods passed to Eli upon delivery to the FTZ. Pursuant to the agreement, Finkenrath shipped the goods ordered by Eli from Antwerp to the FTZ in Buffalo. Finkenrath billed Eli for this shipment, and the parties agreed that payment of the applicable customs duty would be Eli's responsibility (Pohllman Aff., p. 3). The goods remained in the FTZ because Eli did not pay the duty required to remove the goods for import into the United States. Thus Finkenrath complied with the delivery terms indicated in the agreement. Title passed to Eli in the FTZ, although Eli failed to remove the goods by its failure to pay the required duty. Although title is not the equivalent of "rights in the collateral," a determination of which party has title to the goods can be a critical step in finding whether the debtor has such rights. In *Montco, Inc. v. Glatzer (In re Emergency Beacon)*, 665 F.2d 36 (2d Cir.1981), the Second Circuit considered title to be the determining factor of whether the debtor had rights in the collateral sufficient to sustain a security interest. The court wrote, "[T]he question whether [the debtor] had any rights in the [goods] in 1975 turns on when title to the [goods] passed...." *Id.* at 40. Although the court was referring to the time at which title passed from the debtor to a subsequent purchaser, the case is no less controlling.

This Court notes that there is authority suggesting that physical possession of the collateral is necessary for the debtor to have sufficient rights to support a security interest. *See, e.g., Kinetics Technology International Corp. v. Fourth National Bank of Tulsa*, 705 F.2d 396, 399 (10th Cir.1983) ("any interest other than naked possession" constitutes debtors rights in the collateral); and *United States v. Truitt (In re Ivy)*, 37 B.R. 285, 287 (Bkrtcy. E.D.Ky.1983) ("there is strong support for the proposition that the term 'possession' refers to actual, physical possession as opposed to constructive possession"). Nevertheless, these cases do not involve delivery of goods to someone other than the debtor; nor do they contemplate circumstances where the debtor enjoys control or authority over the goods without physical posses-

sion.[4]

The case of *Chartered Bank of London v. Chrysler Corp.*, 171 Cal.Rptr. 748, 115 Cal.App.3d 755 (Cal.Ct.App.1981) is instructive. *Chrysler* involves the delivery of a boat by a manufacturer to a warehouse. The manufacturer instructed the warehouse that possession of the boat was not to be relinquished to the dealer until the dealer paid the full price for the boat. Meanwhile, the dealer entered into a contract with the buyer to sell the boat, under which the dealer purported to retain a security interest in the boat to secure payment of the balance due by the buyer. This security interest was then assigned by the dealer to a bank. Despite the purported sale, the dealer made no payment to the warehouse for the boat, the warehouse never delivered the boat to the dealer, and the buyer never received possession of the boat. The manufacturer reclaimed the boat from the warehouse and, shortly thereafter, the buyer defaulted. The bank sued the manufacturer for conversion, asserting its alleged security interest in the boat.

Addressing the issue of whether the buyer had sufficient rights in the collateral, the court explained that because the manufacturer did not intend to relinquish possession of the boat to the dealer until the dealer paid the purchase price to the warehouse, the dealer never possessed the boat. Therefore, the buyer never took possession and did not acquire sufficient rights in the boat to create a security interest.

In the present case, Eli had a far greater interest in the goods in the foreign trade zone than the dealer in *Chrysler*. Under § 2–401 of the U.C.C., title is considered to have passed to Eli upon delivery of the goods to the FTZ. Finkenrath did not make delivery or possession of the goods contingent upon payment of the full purchase price by Eli. Rather, Finkenrath's agreement with Eli provided that "payment for the goods would be by Bills of Exchange, a form of time draft common in

Germany" (Pollmann Aff., ¶ 3). The only thing preventing Eli from taking the goods in the first shipment into the United States was its failure to pay the customs duty.

Furthermore, although Eli could not transport the goods to its place of business in Buffalo without payment of the duty, Eli could have disposed of the goods while they remained in the FTZ. 19 U.S.C. § 81c provides that goods may be introduced into an FTZ and dealt with in a number of ways without the requirement of paying duty on the goods. "The practical effect of foreign goods entering the foreign trade zone is that although physically imported into the United States, while they remain in the foreign trade zone and provided they are finally exported to a foreign port without distribution within the United States, they are not subject to import duties." *A.T. Cross Co. v. Sunil Trading Corp.*, 467 F.Supp. 47, 48 (S.D.N.Y.1979). In view of the fact that title to the goods passed to Eli upon delivery at the FTZ under the U.C.C., Eli could have manipulated and disposed of the goods in a host of ways without having to pay duty on them. Eli had a considerable "degree of control or authority" over the goods even while they remained in the FTZ. *Kinetics Technology*, 705 F.2d at 399.

Therefore, applying the relevant provisions of the U.C.C. according to New York's choice of law rules, this Court concludes that Eli took title to the goods in the first shipment upon their delivery to the FTZ, subject to a security interest held by Finkenrath. Further, Eli possessed the authority to exercise a considerable degree of control over the goods even while they remained in the FTZ, according to 19 U.S.C. § 81c. Therefore, Eli possessed sufficient "rights in the collateral" to give HSBC a security interest under U.C.C. § 9–203.

## U.C.C. § 9–113

HFH argues that it acquired an automatically perfected security interest according to U.C.C. § 9–113. This section provides:

---

**4.** *See also* 69 Am.Jur.2d § 285, 118–119 ("One of the conditions for attachment of a security interest is that the debtor have 'rights in the collat-eral.' This would imply that delivery of the collateral to the debtor *or* possession by him is normally necessary ..." (emphasis added).

A security interest arising solely under the Article on Sales (Article 2) is subject to the provisions of this Article except that to the extent that and so long as the debtor does not have or does not lawfully obtain possession of the goods

(a) no security agreement is necessary to make the security interest enforceable; and

(b) no filing is required to perfect the security interest; and

(c) the rights of the secured party on default by the debtor are governed by the Article on Sales (Article 2).

HFH argues that even if the U.C.C. is applicable, and even if Eli did acquire sufficient rights in the goods upon delivery to the FTZ to give HSBC a security interest under § 9–203, Finkenrath nevertheless acquired an automatically perfected security interest in those goods superior to that of HSBC. As indicated above, U.C.C. § 2–401 provides that a title retention agreement such as the one in this case operates to reserve a security interest in the seller. HFH argues that upon attachment of this security interest Finkenrath gained automatic perfected status under § 9–113 without the need for filing, because Eli never acquired "lawful possession" of the goods.

The parties acknowledge that there exists neither state nor federal case law that is analogous to the present facts. However, after undertaking an exhaustive survey of the cases dealing with § 9–113, this Court concludes that Finkenrath did not acquire an automatically perfected security interest superior to that of HSBC. The Court finds that Eli did obtain sufficient rights in the goods to extinguish any automatic security interest that Finkenrath may have acquired.

HFH's reliance on § 9–113 is misplaced. The cases indicate that in order for a seller to acquire an automatically perfected security interest under § 2–401 the seller must retain possession of the collateral. "[W]hen the seller loses possession of the goods the Article 2 security interest not only becomes unperfected but essentially ceases to exist." *Data General Corp. v. Still (In re Ault)*, 6 B.R. 58, 64 (E.D.Tenn.

1980). *See also Rex Financial Corp. v. Mobile America Corp.*, 119 Ariz. 176, 580 P.2d 8, 10 (1978) ("[Section 9–113] pertains only to a security interest of a seller of goods who retains possession of the goods, and has no bearing on the rights of the creditors involved here.").

■ In the present case, Finkenrath surrendered title and possession of the goods in the first shipment upon delivery to the FTZ pursuant to U.C.C. § 2–401. This Court finds that at the same time Eli acquired rights in the collateral sufficient to create HSBC's security interest, Finkenrath lost possession and any Article 2 security interest it may have had. Without more authority, this Court does not hold that an Article 2 security interest requires that the seller retain possession of the collateral. However, this Court does hold that in this case the interests given up by Finkenrath and acquired by Eli were enough to extinguish any Article 2 security interest. Again, it is helpful to note that under 19 U.S.C. § 81c Eli had the right to dispose of the goods in the FTZ in a number of ways without having to pay customs duty. This right is a further indication that Eli had "possession" for the purposes of § 9–113, and that Finkenrath no longer had any Article 2 security interest.

Even assuming that Finkenrath did maintain an Article 2 security interest at the time of delivery to the FTZ, HSBC's security interest would still have priority. HFH fails to recognize that a secured party under § 2–401 has only those remedies provided under Article 2. *See* §§ 2–705, 2–706, 2–707(2), and 2–702. Finkenrath and HFH failed to pursue these remedies. The relevant documents show that the first shipment was shipped to the FTZ on July 25, 1987. However, Finkenrath did not arrange for return of the goods upon Eli's default in payment until the summer of 1988. The return agreement was executed on August 30, 1988. Thus reclamation came after the expiration of the ten day period provided by U.C.C. § 2–702. *See O'Brien v. Chandler*, 107 N.M. 797, 765 P.2d 1165 (1988).

## PERFECTION AND PRIORITY

██ Now that the respective interests of Finkenrath, HFH and HSBC have been determined, it is necessary to determine their priority. According to U.C.C. § 9–312(5)(a), conflicting security interests rank according to priority in time of filing or perfection. "Priority dates from the time a filing is first made covering the collateral or the time the security interest is first perfected, whichever, is earlier...." Here, HSBC obtained a perfected security interest in the goods as of the date of filing, December 5, 1987. As indicated above, Finkenrath had no automatically perfected security interest under Article 2. Therefore, it obtained a perfected security interest upon filing on April 28, 1988. Consequently, HSBC had priority under § 9–312 and possessed a superior interest to Finkenrath and HFH as Finkenrath's agent.

Therefore, HFH is liable for conversion of the goods as a matter of law. HFH stands in the shoes of Finkenrath, whose security interest in the goods was subordinate to the security interest of HSBC. By reclaiming the goods and removing them from the FTZ, HFH converted the goods and must now account to HSBC for their value to the extent the goods secured Eli's debt to HSBC.

## GOODS IN THE SECOND AND THIRD SHIPMENTS

Summary judgment is appropriate with respect to the second and third shipments as well. Here, the issues are less complex because the goods did not remain in the FTZ; HFH pre-paid the customs duty. Therefore, HFH raises no argument that Eli did not acquire sufficient "rights in the collateral" to give HSBC a security interest under U.C.C. § 9–203. It is clear from the motion papers that HSBC's security agreement with Eli encompassed the goods con-

tained in the second and third shipments. These interests attached upon delivery of the goods to Eli by HFH. They were perfected as of the date of HSBC's filing of the U.C.C.–1 financing statement: December 5, 1987. Therefore, under U.C.C. § 9–312, HSBC had priority over HFH and Finkenrath, which did not file until April 28, 1988. By recovering the goods, HFH converted property in which HSBC had a superior interest, and HFH is liable for the value of the goods to the extent the goods secured Eli's debt to HSBC.[5]

## ARGUMENTS REGARDING ISSUES OF FACT

Finally, this Court will address a number of issues raised by HFH in opposition to summary judgment. HFH believes that there are a number of factual issues precluding summary judgment at this time.

First, it should be stressed that to defeat summary judgment under Fed.R.Civ.P. 56(e), the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The Supreme Court has explained that "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment...." *Id.* at 249, 106 S.Ct. at 2510, 91 L.Ed.2d 202. In light of this standard, this Court will examine the issues raised by HFH in opposition to summary judgment.

██ First, HFH questions whether Eli was actually indebted to HSBC. HFH argues that because HSBC has failed to produce any waiver by Eli of the discrepancies between the first letter of credit and the documents produced for payment thereunder, Eli may have a defense to payment under the first letter of credit. This Court

**5.** In its answer, HFH raises the defense that Finkenrath took the goods free of any security interest as a buyer in the ordinary course of business, under U.C.C. § 9–307(1). Although HFH does not address this defense in its memoranda, it is clear that, as a matter of law, HFH is not entitled to this defense. Finkenrath did not achieve status as a buyer in the ordinary course

of business as defined in U.C.C. § 1–201(9). The definition specifically excludes transfers as security for or in satisfaction of a money debt. Eli's shipment of the goods through HFH to Finkenrath was done in satisfaction of its debt to Finkenrath, and pursuant to the security interest created under Article 2 and the title retention agreement.

does not find that the absence of a waiver in the motion papers precludes summary judgment for HSBC. HFH does not describe the alleged discrepancies between the documents. The documents show that the amount paid to the beneficiary was equal to the amount specified in the first letter of credit. Further, the papers indicate that Eli never objected to the alleged discrepancies. Eli even agreed to a liquidation to repay interest and costs under the extensions of credit. Under these circumstances, HFH cannot be heard to challenge the existence of a debt under the first letter of credit.

■ Next, HFH argues that because HSBC participated in some way in the liquidation of Eli's assets, there may have been some violation of the commercial reasonableness standard contained in New York's U.C.C. § 9–507. Nonetheless, it is clear from the papers that Eli itself conducted the liquidation (LeClair Mar. 29 Aff., ¶ 6; LeClair answer to Interrogatory No. 2; Defendant's Supp.Memo, exh. C). These documents indicate that the sale of assets was to be conducted by Eli, and that proceeds were to be paid to HSBC to reduce Eli's debt. Therefore, cases cited by HFH indicating that the secured party may be liable to junior or unsecured creditors are inapposite. *See Liberty National Bank v. Acme Tool*, 540 F.2d 1375 (10th Cir.1976); and *Sheffield Progressive, Inc. v. Kingston Tool Co.*, 10 Mass.App.Ct. 47, 405 N.E.2d 985 (1980). Those cases involve liquidation conducted by the secured party itself. This Court finds that § 9–507 does not extend to the actions taken by HSBC.

■ Furthermore, even if HSBC itself conducted the liquidation, and even if its disposition of the collateral did not meet the standard of § 9–507, HFH would still lack standing to challenge the reasonableness of the disposition. The statute provides:

> If the disposition has occurred the debtor or any person entitled to notification or whose security interest has been made known to the secured party prior to the disposition has a right to recover from the secured party any loss caused by a failure to comply with the provisions of this Part.

Standing to object to the secured party's disposition is given by the statute to the debtor and to those entitled to notification under §§ 9–505(2) or 9–504(3), i.e., other secured parties from whom the secured party conducting the disposition has received written notice before the secured party sent his own strict foreclosure or disposition notice to the debtor under these provisions. *See* Callaghan, UNIFORM COMMERCIAL CODE SERIES § 9–507:05 (1990). HFH did not have standing under § 9–507 because it had no security interest in the collateral liquidated by Eli, nor did it provide any notification to HSBC prior to the liquidation. In any event, HFH's arguments regarding the disposition of the collateral are merely speculative. On the basis of the papers submitted, this Court does not find that the allegations of HFH are sufficient to create an issue of fact warranting a trial on the issue of liability.

Similarly, this Court does not find that HFH has made a factual showing sufficient to raise a material issue of HSBC's good faith, such that equity would require a reversal of the parties' priorities as to the second and third shipments. HFH cites *Limor Diamonds, Inc. v. D'Oro by Christopher Michael, Inc.*, 558 F.Supp. 709 (S.D.N.Y.1983) for the proposition that where a secured party exercises control over the debtor and acts through the debtor to better its secured position at another's expense, equity may disregard the secured party's priority interest. *Limor* involved allegations that the secured party wrongfully seized collateral. HFH points to the close proximity in time between the second and third shipments, the execution of security interests by Eli, and the issuance of the first letter of credit. Further, HFH notes that the time drafts given by Eli to Finkenrath and HFH for payment were drawn on HSBC. However, HFH does not produce any facts suggesting the type of bad faith alleged in *Limor*. Specifically, *Limor* involved facts that strongly indicated collusion between the secured party and the debtor. HFH provides no

facts indicating that there was such collusion on the part of HSBC and Eli. HFH speculates that oral depositions may uncover bad faith, but the facts do not reveal a triable issue of fact relating to HFH's liability for conversion.

Next, HFH disputes the amount recovered by HSBC after the liquidation by Eli, and the way that this amount was applied to offset Eli's outstanding debt to HSBC. Specifically, HFH refers to answers to interrogatories and supporting affidavits that contain divergent statements about whether the proceeds from the liquidation were applied toward "outstanding interest owed under the letters of credit" (Answer to Interrogatory No. 2), or toward "Eli's indebtedness to HSBC incurred under an overdraft loan facility between HSBC and Eli that was also secured by HSBC's security interest in Eli's inventory and to the reduction of interest and expenses owed under the Letter of Credit" (LeClair Mar. 29 Aff., ¶ 6). This Court does not believe this discrepancy creates a triable issue of fact relating to liability. The amount of the proceeds and the extent to which the proceeds were applied toward Eli's outstanding debt under the letters of credit is an issue of damages that HFH will not be precluded from investigating through further discovery. This is especially true in light of the fact that it appears the proceeds were not sufficient to discharge the debt owed by Eli to HSBC under the letters of credit.

■ Finally, HFH argues that issues of damages are so intertwined with issues of liability that summary judgment regarding liability is inappropriate, citing *Klinger v. Rose*, 291 F.Supp. 456 (S.D.N.Y.1968) and *Blau v. Lamb*, 163 F.Supp. 528 (S.D.N.Y. 1958). This is not the case. HFH is liable for conversion of the goods in each of the shipments, as discussed fully above. The only unresolved issues involve damages. These issues are limited to the value of the goods converted by HFH, and the extent to which the goods secured the debt owed by Eli under the letters of credit. Although these issues may justify some investigation into the results of the liquidation of other collateral, summary judgment on the issue of liability is not precluded. This Court will permit HFH to conduct the appropriate discovery and raise these issues at a trial on damages, if they are relevant.

### CONCLUSION

Therefore, summary judgment for HSBC is granted as to the issue of HFH's liability for conversion of all three shipments. Summary judgment is denied as to the issue of damages, for the reasons discussed above.

### ORDER

IT HEREBY IS ORDERED, that plaintiff's motion for summary judgment is GRANTED, as to the issue of HFH's liability for conversion of all three shipments. Plaintiff's motion is DENIED, as to the issue of damages.

SO ORDERED.